# WHEELING.

MILLER, USE &C. *v.* INSURANCE COMPANY.

July 23, 1875.

1875.
June Term.

1. Generally, in cases where there is a real conflict in the testimony of witnesses as to a material fact directly involved in the issue, and the determination involves the credibility of the contradicting witnesses, the finding of the jury upon the fact will not be disturbed by the court; and such finding of the jury will not be disturbed by the appellate court where it has been approved by the court below. And in such case, where there is a demurrer to the evidence, and the court below, which saw and heard such contradicting witnesses (who are the demurree's witnesses) give their evidence, renders judgment in favor of the demurree, generally, the appellate court will not disturb such judgment, by reversing it.

2. A demurrer to evidence withdraws from the jury, the proper triers of facts, the consideration of the evidence by which they are to be ascertained, and the party whose evidence is thus withdrawn from its proper forum is entitled to have it most benignly interpreted by the substitute. He ought to have all the benefit that might have resulted from a decision of the case, by the proper forum.

3. Upon a demurrer to evidence in ascertaining the facts proved, directly or by inference, the court must not be unmindful of the effect of a demurrer to evidence. By it the demurrant allows, at the least, full credit to the evidence of the demurree, and admits all the facts directly proved by, or that a jury might fairly infer from, such evidence. And in determining the facts inferrible, inferences most favorable to the demurree will be made in cases of grave doubt.

This was a *supersedeas* to a judgment of the circuit court of Ohio county, rendered on the 15th day of December, 1873, granted by a Judge of this Court, on the

petition of the Franklin Insurance Company, the defendant below. The action was instituted in the name of Isaac Miller, on the 28th day of May, 1872, who sued for himself and for the use of Luther E. Magee, David McConnell and L. V. Applegate, "late owners of the steamboat called 'Wash. Sentell.'" The action was in form assumpsit, upon a policy of insurance, No. 972, issued by the defendant Company to the plaintiff Miller, whereby an insurance for the sum of $2,000 was effected, in the name of said Miller, upon said steamboat for the period commencing at noon on October 24, 1871, and ending at noon on October 24, 1872, "with permission to navigate the Mississippi and tributaries, except the Missouri and Arkansas rivers." The annual premium stipulated to be paid on account of said policy was $360.

It is not deemed necessary to set out said declaration or policy in full. On the 2d day of November, 1872, the defendant appeared, and, on its motion, the judgment entered in the office was set aside, and thereupon the defendant pleaded "that it did not assume upon itself in manner and form, as the plaintiff in his declaration against it has alleged, and of this it puts itself upon the country and the plaintiff doth the like."

On the 22d day of May, 1873, a jury was sworn to try the issue joined, and, having heard the evidence, the defendant filed a demurrer to the same, and the plaintiff joined therein; whereupon the jury rendered a verdict for the plaintiff, in case the judgment should be given for the plaintiff on the demurrer to the evidence, for the sum of $1,230.64, subject to deductions of $490.77 and $358.20; and in case the judgment should be for the defendant upon the demurrer to the evidence, then for the defendant.

On the trial of the cause the plaintiff, to support the issue on his part, introduced the depositions of L. E. Magee and P. A. Barker, certain protests as to the loss of said steamboat Wash. Sentell, policies of insurance issued on said steamboat by the defendant Insurance

Company, the Peabody Insurance Company, the Citizens' Fire and Marine Insurance Company, and the Eureka Insurance Company, and certain notes hereinafter referred to.

The witness Magee, in his deposition, or so much as is deemed material, states, in substance, as follows: That on the 24th of October, 1871, the said Miller and Applegate were the owners of one-sixth, each, of said steamboat, and the said McConnell and Magee one-third thereof each; and that these parties continued to be the owners from that date till the loss of said boat; that Magee was the captain of said boat during all that period; that the said boat, while navigating Cypress bayou, a tributary of Red river, struck a stump, without any fault of the officers or crew, which caused her to spring a leak, from which she sunk in a short time thereafter; that all the means and force at the command of the captain was employed to prevent her sinking; that this occurred January 7, 1872; that the loss was a total loss in the opinion of witness; that a protest, in due form, was made on January 8, 1872, before a notary public of Marion county, Texas, and notice of said loss forwarded by telegraph and otherwise to P. A. Barker and others at New Orleans, and by mail to the defendant Company, at Wheeling, which was received by the same; that in September or October, 1871,—which date the witness cannot state positive—Barker came aboard the said boat, then lying at the wharf in New Orleans, and demanded payment of a note that had been executed on behalf of the said boat to the defendant Company, for the premium on a policy of insurance theretofore effected on said boat, for the year expiring on or about October 24, 1871; that while these negotiations looking to a settlement of that note were going on, the said Barker proposed to insure the said boat for the year ending October 24, 1872. The testimony of the witness does not disclose clearly what terms were proposed by him for the insurance of the boat. It is stated in the printed record that witness

1875.
June Term.

Miller, use, &c.,
v.
Insurance Co.

stated that the insurance on the boat was about to ex-pire—he "didn't know exactly the time that it did"—and that he would have "to look round about some new insurance;" that witness did not ask Barker to make arrangements "to take insurance in this Wheeling Company; that witness did not tell Barker "to write to anybody about insurance," and that no further conversation upon this point "occurred at that time." Barker stated at that time that he would communicate with the Company at Wheeling about dividing up the note given for the premium on the policy for the year ending October 24, 1871—the witness having stated to Barker that he was unable to pay the same at that time, and having proposed to "put this note in three notes, making them payable in two, four and six months," "and giving city (New Orleans) acceptances" on same. The witness deposes that Barker stated to him, subsequent to this time, that he (Barker) had a letter from the Company accepting his said proposal, and proposing "that they would re-insure the boat at the limit of $8,000 at the same rates we had before." The letter, which was read to witness by Barker, containing this proposition, will be hereinafter found in the statement of the testimony of Barker. Witness states that "this is the letter Barker showed him," and "the letter he accepted the insurance proposition on."

The witness then states that "the next thing that occurred about this insurance was some dispute about the acceptance on the new premium notes;" "that Barker found out, some way or other," witness couldn't tell how it occurred, "that Noble and Woods," who had accepted the before named three notes, "wouldn't accept the new premium notes, because they considered it a new thing for a boat to give acceptances of premium notes, and they didn't have to do it, and they wouldn't do it." Barker then, witness states, telegraphed "to know whether they would carry the risk without acceptances on the paper," and Mr. Coen answered by letter, that Barker showed

witness, that they would. And witness thinks that on the day of this occurrence that the new premium notes were executed. In answer to a question by plaintiff's counsel, the witness gave the following statement connected with the execution of the new notes and of the policy sued on:

"It was in Mr. Barker's office; he had the notes all all wrote up and the policies already in his office, signed up; I signed the notes and he gave me the policies; looking over the policies, there was some things about them that I would have liked to have different if I had thought; I didn't suppose Mr. Coen or any other man would object to writing a new set up and swapping them with me, but the ones I had was good enough, and I took them; then, says Mr. Barker, 'if you think they don't treat you right, you can quit any time you want to if you pay *pro rata* rates;' I told him that I would leave the policies in his office for the present; that my boat was loaded and I was ready to go up Red river until he would hear from these policies in Wheeling, and when he found out if they concluded to write up a new set in lieu of them, to take them to my office and leave them; and if they didn't make that change to take there —— we had and leave them there; Mr. Barker, of his own accord, took the notes, as he says."

After the sinking of the boat witness states that he came to Wheeling to effect a settlement with the defendant Company, and that he had several conversations with Mr. Coen, the secretary of the defendant Company; that in one of these conversations Coen "said he had no risk on the boat, and consequently was not liable; the company was not liable, and his reason for that was—he went on to tell me why he did not consider liable; he said he had returned the policies, and he thought we had got insured some other place, and cancelled the policies some time in December, I think he said; after not hearing from us for a long time, he thought we had got insurance in some other company, and he had cancelled

the policies; I asked Mr. Coèn, if he concluded to cancel them, why he didn't send us back our notes, if he thought he had a right to cancel the policies without notice to the owners of the boat; he said he didn't consider the notes of any value to us or to them either."

Several negotiable notes were introduced in evidence in connection with the testimony of witnesses all signed "Steamer 'Wash. Sentell' and

Owners,

(L. E. MAGEE, Captain,)"

for various amounts, all dated New Orleans, October 2, 1871, payable at various dates to Moran, Noble & Woods and endorsed by said Moran, Noble & Woods and others, all of which were duly protested for non-payment; also a note executed for the whole or a part, of premium due on account of insurance on said boat for the year ending October 24, 1871, payable to defendant Company and signed "Isaac Miller, for owners steam boat Wash. Sentell," also a note for $360 at six months payable to defendant at office of P. A. Barker, New Orleans, La., signed "for steam boat 'Wash. Sentell' and owners, L. E. Magee, Captain," the same being dated October 24, 1872, and expressed on the face "being policy 792 on steam boat 'Wash. Sentell.' "

The last two notes were not endorsed.

The witness further states that while in Wheeling, and in the month of March, 1872, he stated to Coen that he "would be obliged to do something with the boat, while this thing was being settled; she would be lost unless some active effort was made, and that he hardly felt authorized to act for the Insurance Company unless he had some authority to do it; he asked Coen for written authority to go there and dispose of her the best he could for the interest of the Insurance Company and owners. Coen didn't acknowledge having any interest in the boat;" but, in response to the statement, gave to witness a paper in the following words and figures:

1875.
June Term.

Miller, use, &c.,
v.
Insurance Co.

"WHEELING, W. VA. March 12, 1872.

*Captain L. E. Magee.*—DEAR SIR : This Company not acknowledging any liability to your claim for loss of steamboat 'Wash Sentell,' therefore cannot object to your making any disposition of the wreck you may deem proper.

C. M. COEN, Secretary."

The witness further stated that the first time he saw the policy issued in October, 1871, after he delivered it to Barker, in New Orleans, was at Coen's office in Wheeling ; that he had received the sum of $512 from the wreck of the boat and expended in recovering salvage, including his own time and expenses, the sum of $1676.-72; that in fact the new premium notes were executed and delivered after October 24, 1871, though dated on that day ; that Barker was not authorized to take the notes until he received the authority from the Company ; that Barker gave witness the policy when he (witness) gave Barker the premium note.

On cross examination the witness stated, as a reason why he left the policy with Barker, that he " told him (Mr. Barker) that he would leave them policies with him in his office, as it was but a few squares from his office to our own agent's office ; and when he found out whether they were willing to make these little changes suggested there to send back these policies when they sent new ones; if they didn't make the change to send them to my agent, and we would get them when we wanted them."

The change referred to was a reduction in the rate of insurance and a change in the policy, so that the same should run in the name of Magee, captain.

Witness stated that he never took the policy out of Barker's office after he (witness) left it there.

Barker, another witness for plaintiff, testified that he made the settlement of the old note substantially as is set forth in the testimony hereinbefore stated of Magee ;

66

that he did not solicit the insurance on the boat for the year commencing October 24, 1871; that his connection with the matter grew out of his said settlement of the old note; that Coen, in response to a letter from him, agreed to the terms proposed for said settlement, and also, on the part of defendant Company and the other companies, to insure the boat again; that the letter which witness wrote in this connection was as follows:

"NEW ORLEANS, Sept. 30, 1871.

*C. M. Coen, Esq., Secretary Franklin Insurance Company, Wheeling, Va.:*

DEAR SIR—I have seen the captain of the 'Wash Sentell' and one of the owners; they say that they have no money at present, but will pay the notes. Offer to give their draft for the amount of note, including costs of protest, and ten per cent. interest, payable in two, four and six months from 1st October, to be accepted by Messrs. Moran, Noble & Woods, of this city, who are regarded here as A. No. 1 and men of means. They claim, however, a deduction for payment of general average, as per bill enclosed, which would amount to $352.30, as the boat was insured for $10,000. Captain Miller is not in New Orleans. Messrs. Moran, Noble & Woods have told me that they would accept for them if desired. They also wish to make arrangement to insure another year. Yours truly,

P. A. BARKER."

That Coen answered this letter as follows:

"WHEELING, W. VA., October 5, 1871.

*P. A. Barker, Esq., New Orleans:*

DEAR SIR—Your favor of 30th ultimo at hand. We have been again and again disappointed in not receiving the money of the 'Sentell;' repeated promises were made by Mr. Miller. I enclose the correspondence regarding the taking of the risk. You will observe that the Eureka policy was written after the occurrence of the accident, though dated same as others. The Eureka was advised

of the accident, but was informed no claim would be made, otherwise would not have had policy attach with the rest; *therefore,* only ($7,500) seventy-five hundred were actually covered. From the correspondence you will see that we never expected to be called on to pay general average, nor were we apprised of such claim until January 16th, at Portsmouth, Ohio, and 18th here. The conditions of our policies require that proofs shall be furnished in thirty days after loss, while this loss occurred on the 5th, now being more than two months, and never a word said since about it. This would, by strict construction, relieve us. We are well aware that boat business has been worse than bad the past year, but this does not relieve us from paying any loss that occurs. We must be up to time whether or not the boats pay us. We consider Mr. Miller and rest of owners of 'Sentell' A 1 men, and willingly accommodate them by the extension of time. To wait longer for our money is really onerous, (interest don't pay,) and to make easy all round I suggested and insisted on the other companies granting their request by receiving the notes as offered, accepted by M. N. & W., and insure the boat again, limit $8,000, at same rate, six months, accepted notes, they making no claims for. Advise result by night telegram.

Yours, truly,                    C. M. COEN:"

That witness telegraphed Coen as follows on October 26, 1871:

" *To C. M. Coen, Franklin Insurance Company:*

Renew eight thousand on 'Wash Sentell' as agreed upon; all satisfactory. Send policies to me.

P. A. BARKER:"

That Coen answered this telegram as follows:

"WHEELING, W. VA., Oct. 29th, 1871.
*P. A. Barker, Esq., New Orleans:*

DEAR SIR—As per telegraph, I now enclose policies, Franklin, Ætna, Citizens and Peabody for $2,000 on S. B. 'Wash Sentell,' also notes for same as per agreement

for signature and return. Note the boat is making regular trips, and trust she may not only continue so with safety, but profitably to owners. Just home with plenty to do. Yours truly,

C. M. COEN, Secretary :"

That witness also wrote them on the 27th of October, to that effect, which letter was as follows:

"NEW ORLEANS, October 27, 1871.

*C. M. Coen, Esq, Secretary Franklin Insurance Company,
Wheeling, W. Va.:*

DEAR SIR:—As per instructions received in yours of the 5th inst., I have settled the 'Wash Sentell' matter, they giving their three notes as agreed upon, and waiving general average claim, and adding ten per cent. interest from maturity · of first note until paid. You will find stamps and protest fee ($1.50) put in the last note. I telegraphed you of the acceptance of your proposition, which was also to renew the insurance on tne boat for $8,000, they to give six months' note endorsed by Messrs. Moran, Noble & Woods for same. I trust that this settlement will be fully satisfactory to you. If the policies of insurance have not already been sent, please have inserted, loss, if any, payable to Messrs. Moran, Noble and Woods, as interest may appear. I will have the notes signed on receipt of policies, and send them to you. Have had an examination of damage sustained by steamer Era No. 10, and instructed owners to have necessary repairs made, after which I will have another examination to see that no more has been done and report result of same to you. I return letters relating to 'Wash Sentell' matter. Yours truly,

(Signed)     P. A. BARKER :"

That the policies mentioned in the letter of October 29th, were received by witness, and were "held by him in the first place, because Messrs. Moran, Noble & Woods refused to endorse the notes according to previous agreement, made with the owners of the 'Wash Sentell'

and sanctioned by Mr. Moran; that witness wrote the Company for further instructions, as follows:

"NEW ORLEANS, November 4th, 1871.

*C. M. Coen, Esq., Secretary Franklin Insurance Company, Wheeling, Va.:*

DEAR SIR:—Messrs. Moran, Noble & Woods will not endorse the notes for insurance on the steamer 'Wash Sentell;' say that they were willing to endorse the notes for premiums past due, but will not do so for an unearned premium, as they can insure the boat without. Mr. Moran, the member of the firm who made the agreement to do so, has been overruled by his two partners, who say if you are not willing to insure the boat without an endorser, that they will get the boat insured themselves in Pittsburgh, where they were offered nine months' time on all steamboats without endorsers. Please·inform me by telegram immediately on receipt of this whether you are willing to carry the insurance without endorsers on the notes, and if not, I will return the policies to you. Yours truly,

(Signed)     P. A. BARKER:"·

That witness received the following telegram in answer to the latter letter:

"To P. A. BARKER, 58 Carondalet street.
'Wash Sentell' good fellow; take the boat's note.
C. M. COEN:"

That witness, upon receipt of the latter telegram, took the boat's notes for policies previously sent, and enclosed same to the Company, together with a statement as to the change in said policies. The alteration desired is more fully explained by the following letter:

"NEW ORLEANS, November 9th, 1871.

*C. M. Coen, Esq., Secretary Franklin Insurance Company, Wheeling, Va.:*

DEAR SIR:—Enclosed please find notes of 'Wash Sentell.' I return policies for alteration—1st, boat to be

insured in the name of L. E. Magee, captain; 2d, insert in policies, portion of loss, if any, payable to Moran, Noble & Woods, as interest may appear; 3d, owners object to the average clause of ten per cent. Say that their former policies were to have been written with the five per cent. average clause, and these were to be written at the same terms. If it is not changed they claim the right to cancel at pro rata rates and pay for the time the policies may have been in force. One of the policies is right in that respect and accepted.

Will write you in regard to Era No. 10 to-morrow. Yours truly,

P. A. BARKER."

The record does not show that this last letter was, specially, answered.

On the 25th of November, 1871, Coen wrote to witness as follows:

"WHEELING, W. VA. November 25, 1871.
*P. A. Barker, Esq.:*

DEAR SIR :—Here I am troubling you again. Your only recourse is to make bill against me and forward. I am to-day in receipt of sundry bills for repairs, &c., of S. B. 'Wash Sentell,' certified to by E. Joy, Notary, amounting to the sum of $1,010.89. The policies were written for $10,000, amount of limit valuation $14,000, and average 10 per cent. The loss being but $1,010.89, value $14,000, makes damage only $7.22 per cent. which would equal $180.50 on $2,500, provided we were under the policy liable.

Please make this known to the parties interested. I have *waited* these bills before sending the new policies back, and while now writing can't lay my hand on yours giving particulars. Write me. Yours,

C. M. COEN, Secretary :"

That Barker answered this last letter as follows:

"NEW ORLEANS, December 2, 1871.    1875.
                                              June Term.

*C. M. Coen, Esq., Secretary Franklin Insurance Company,* Miller, use, &c.,
    *Wheeling, Va.:*                                       v.
                                                    Insurance Co.

DEAR SIR:—Yours of the 23d inst. received. Have seen owners of the 'Wash Sentell,' who have given me the enclosed memorandum of amount paid for repairs, for which they have vouchers. Also copy of letter written you by them advising you of damage. The owners of the 'Sentell' say that the agreement made between them and your agent at Portsmouth, Ohio, Mr. Bensall, was that they were to be insured according to the printed conditions of the policy, with the 5 per cent. average clause. Captain McGee says he will write you to-day. Yours truly,

                                            P. A. BARKER.

Witness stated that he had an impression that he received a reply to this last letter, but he does not produce it, nor state its contents. He also states that he is under the impression that he received other letters and telegrams from "them," but he does not produce them.

On cross-examination the witness deposes that he was not acting as the agent of either the plaintiff or defendant in these matters, and "has no interest in them;" that the policy was dated prior to November 9, 1871; that the boat was to be insured on the same terms as previously, Messrs. Moran, Noble & Woods endorsing the notes; that witness delivered the policy upon Magee's signing the notes; that the policy was returned by Magee to witness with a request that he should procure the alterations hereinbefore referred to; that Magee never took the policy out of witness' office; that the policy was never corrected as requested; that it never was returned to Magee; that the notes were not endorsed as per original agreement, because witness received instructions, by dispatch, to take boat's notes without endorsement; that this dispatch was the only authority witness had to act in the premises, and that witness acted on it; that

when he received this dispatch the policy was in possession of witness, and that witness had never received any notice of the cancellation of this policy.

The plaintiff proved by said Coen that the policy sued on was duly executed, and that his signature thereto, as secretary of said defendant Company, was genuine.

The defendant to sustain the issue on its part introduced the deposition of said C. M. Coen, secretary of the defendant Company. Coen testified that the policy on which the suit was founded, was procured from the Company by the attorney for the plaintiff, who having asked for a copy of same, the witness proffered him the original which counsel received and took away with him, without leave, as witness deposes, of the secretary; though witness admitted on cross examination that he said "you can take the original" or "there is the original you can take it;" that the witness afterwards asked counsel to deliver up the policy; that this policy was cancelled by witness, as near as he could recollect, on the 9th or 10th of December, 1871, by writing across it the word 'void' and placing it among the cancelled policies; that the other policies enclosed by Barker were delivered by witness to the other companies; that witness received no enquiries about the new policies from the time of the return of the policies by Barker until after the loss of the boat; that he "had no correspondence in regard to the notes, or anything appertaining to the boat, until November 9, asking that those policies be changed;" that this last letter was received by witness about November 13; that he heard no more of Barker or Magee, until notice of the loss, which was in January.

These are the statements of witnesses as found in the printed record.

The court rendered judgment for the plaintiff and for the amount as set forth in the verdict of the jury.

The Hon. Thayer Melvin, judge of the circuit court of Ohio county, presided at the trial below.

*Daniel Lamb*, for the appellant.

*Caldwell & Caldwell*, for the appellees.

HAYMOND, PRESIDENT:

The action in this case is trespass on the case in assumpsit, founded on a policy of insurance made by the defendant (the Insurance Company) to the plaintiff on account of the then owners of the steamboat "Wash Sentell," in the sum of $2,000, upon said steamboat from the 24th day of October, 1871, at noon, to noon of the 24th day of October, 1872, with permission to navigate the Mississippi and tributaries, except the Missouri and Arkansas rivers. The defendant appeared by its counsel at a circuit court of the county of Ohio (in which the suit was brought and pending) on the 2d of November, 1872; and on motion of the defendant the judgment entered against it in the clerk's office of said court was set aside, and for plea to the plaintiff's action the defendant said it did not assume upon itself in manner and form as the plaintiff in his declaration against it hath alleged; and upon this plea issue was duly made up and joined.

The defendant did not demur to the plaintiff's declaration, or make any objection thereto for insufficiency in form or substance. And no exception is made or taken, before this Court, to the declaration for, any cause. The declaration, however, seems to state and allege a legal cause of action by the plaintiff for the use of the owners of the said steamboat in the declaration mentioned against the defendant.

On the 22d day of May, 1873, a jury was duly elected, tried and sworn the truth to speak in the cause upon the issue joined; and, having heard the evidence, the defendant filed a demurrer to the evidence, and the plaintiff joined therein. And the jurors, by their verdict, said that, in case judgment should be given for the plaintiff upon the evidence, then they assessed his damages,

67

by reason of the matters shown in evidence, at $1,230.64, after deducting from the loss claimed by the plaintiff $490.77 on account of premium due the defendant for insurance for said steamboat for the year expiring October 24, 1871, and $358.20 premium on the insurance alleged in the declaration for said boat for the year ending October 24, 1872; and in case judgment should be given for the defendant upon said demurrer, then they found for the defendant.

The record discloses the evidence given before the jury, to which the demurrer was filed. The circuit court, on the 15th day of December, 1873, rendered judgment upon the demurrer to the evidence in favor of the plaintiff against the defendant for $1,230.64, the damages assessed by the jury, with interest thereon from the 22d of May, 1873, together with plaintiff's costs of suit. To this judgment the defendant obtained a writ of *supersedeas* from one of the Judges of this Court in vacation, and it is now to be ascertained and determined whether the circuit court erred in its judgment to the prejudice of the defendant.

The point chiefly relied upon and argued here by the counsel for the defendant is, that the policy of insurance described in the declaration never became a binding contract between the parties under the evidence and the law, and that for this reason the circuit court erred in its judgment.

The principal witnesses introduced in the cause by the plaintiff were L. E. Magee, the captain of the steamboat and P. A. Barker, an insurance agent who acted in the matter, in some degree, as the agent of the defendant. It is clear to my mind that if full credit is given to the evidence of the witness Magee, as disclosed and stated in the demurrer to evidence, his evidence, in connection with the other evidence and the testimony of Barker not in conflict with the evidence of Magee, supports and justifies the verdict of the jury. But it is maintained and argued here by defendant's counsel, that

the evidence of Barker contradicts and is in conflict with the evidence of Magee as to essential and material facts, necessary to make out the plaintiff's cause, and if credit is given to Barker's evidence, so far as it conflicts with that of Magee, and Magee's evidence disregarded, in so far as the conflict exists, the policy of insurance in the declaration mentioned never became a binding contract under the evidence and law, because the policy was not accepted by the plaintiff, but rejected and refused. It is also argued by defendant's counsel that as the witnesses Barker and Magee are the plaintiff's witnesses, and their evidence is conflicting and contradictory as to essential and material facts necessary to make out the plaintiff's case, these essential and material facts must be regarded, upon the demurrer, as not being sufficiently established by either of the said two witnesses; that the evidence of these witnesses, so far as they are in conflict as to any material fact must neutralize each other or be set off one against the other.

On the other hand the plaintiff's counsel claims here that in truth and fact upon a fair and careful comparison and analysis of the evidence of Magee and Barker there is no necessary substantial and material conflict in their evidence as to any material or essential fact involved in the cause, but that in the main their evidence can be reasonably reconciled upon just and fair principles, but that if such conflict exists as argued by defendant's counsel, that still under the law applicable to and governing demurrers to evidence this Court should affirm the judgment of the circuit court. The plaintiff's counsel further argues that upon the whole evidence in the cause the judgment of the circuit court is not erroneous.

To arrive at a correct conclusion in this case, it is necessary in the *first* place to ascertain the law relating to a demurrer to evidence, which should direct and govern this Court in reviewing the judgment of the court below. In Phillips Evidence, vol. 2, 3d ed. 467, it is stated as law that, "as it is the peculiar province of the

jury to ascertain the truth of facts and the credibility of witnesses the party ought not to be allowed, by a demurrer to evidence, or any other means, to refer the trial of such questions to another tribunal. A demurrer must, therefore, admit the truth of all facts, which the jury might find in favor of the other party upon the evidence laid before them, whatever the nature of that evidence may be, whether of record, or writing or by parol." See also *Gibson v. Hunter*, 2 H. Bl. 209. "The practice of inserting in a demurrer to evidence the evidence on both sides, is proper and well established by the authorities; In such case, the demurrant must be considered as admitting all that can reasonably be inferred by a jury, from the evidence given by the other party; and as waiving all the evidence on his part which contradicts that offered by the other party, or the credit of which is impeached; and all inferences from his own evidence which do not necessarily flow from it." *Muhleman v. Franklin Ins. Co.* 6 W. Va., 508. Under the English practice a demurrer to evidence is a proceeding by which the judges whose province it is to determine questions of law are called upon to declare what the law is upon the facts in evidence. And it is analogous to the demurrer upon the facts alleged in pleading. Phil. Evidence vol. 2, 3d ed. 466. "The effect of a demurrer to evidence certainly does not substitute the court for the jury to pass upon disputed facts, conflicting evidence and the weight and credit of evidence, but to declare the inference of law upon the facts proved, in like manner as it does in a demurrer in law or to the declaration upon the facts stated or averred. Hence according to the English practice, the demurrant is required to withdraw all his own testimony, admit the credibility of his adversary's witnesses, and admit upon the record all the facts found by direct evidence and all the facts which it conduces to prove, or may be reasonably inferred, if it be circumstantial, and I presume in the event of a disagreement between the demurrant and demurree as to what facts are

proved or might be reasonably inferred, it would devolve
on the court to decide between them and settle the facts
before compelling a joinder in demurrer. Our practice,
sanctioned and established by repeated adjudications is
different from the English in form—and in form only—
as it is said and leading to the same result. *Homer v.
Speed*, 2 Patton, Jr. & Heath 630, 631. As before
stated, with us the evidence on both sides is inserted in
the demurrer, and the court, by a retrospective process,
when it comes to pass upon the demurrer, is to consider
all the demurrant's evidence in conflict with that of the
demurree, withdrawn, the credibility of his witnesses ad-
mitted, and all the facts admitted, which the demurree's
evidence thus considered proves or conduces to prove, or
which may be reasonably inferred from his whole evi-
dence, both direct and circumstantial; and in drawing
inferences as to what the evidence, whether direct or
circumstantial, and presumptive conduces to prove, if
the evidence be susceptible of several, differing in de-
grees of probability, it is incumbent upon the court to
adopt those most favorable to the demurree, provided
they be not forced, strained or manifestly repugnant to
reason. *Id.* 631. In the case of *Ware v. Stephenson*, 10
Leigh 164 Judge Stanard says: "In ascertaining the
facts proved directly or by inference, we must not be
unmindful of the effect of a demurrer to evidence. By
it the demurant allows full credit to the evidence of the
demurree, and admits all the facts directly proved by,
or that a jury might fairly infer from, the evidence.
And in determining the facts inferrible inferences most
favorable to the demurree will be made, in cases in
which there is a grave doubt which of two or more in-
ferences shall be deduced. In such cases it would not
be sufficient that the mind of the court should incline to
the inference favorable to the demurrant, to justify it in
making that inference the ground of its judgment. Un-
less there be a decided preponderance of probability or
reason against the inference that might be made in favor

of the demurree, such inference ought to be made. The demurrer withdraws from the jury, the proper triers of facts, the consideration of the evidence by which they are to be ascertained, and the party whose evidence is thus withdrawn from its proper forum is entitled to have it most benignly interpreted by the substitute. He ought to have all the benefit that might have resulted from a decision of the case by the proper forum. If the facts of the case depend upon circumstantial evidence, or inferences from facts or circumstances in proof, the verdict of a jury ascertaining these facts would not be set aside, merely because the court might have made inferences different from those made by the jury. To justify the granting of a new trial, when it depends on the correctness of the decision between different inferences to be drawn from the evidence, it would not suffice that in a doubtful case the court would have made a different inference. The preponderence of argument or probability in favor of this different inference should be manifest. When the question is whether or no a fact ought to be taken as established by the evidence, either directly or inferentially, in favor of the demurree, I do not know a juster test than would be furnished by the enquiry, would the court set aside the verdict had the jury, on the evidence, found the fact? If the verdict so finding the fact would not be set aside, it ought to be considered as established by the evidence demurred to." In the same opinion Judge Stanard says upon the same subject that "in ascertaining the facts established by any one witness, everything stated by him, as well on his cross examination as on his examination in chief must be considered. Facts imperfectly stated in answer to one question may be supplied by his answer to another; and when from one statement, considered by itself an inference may be deduced that inference may be strengthened or repelled by the facts disclosed in another." Page 169. "In the case last referred to, the judge also said in the case in judgment, the evidence was

all parol and adduced by the plaintiff. In ascertaining the facts established by it, we must look to all of it, especially in ascertaining the facts established by any one witness, &c.," as stated last above.

The cause turned on the evidence of one material witness, and as his evidence consisted of what he stated on examination in chief as well as what he said on cross-examination and the question as to whether what he said on cross-examination could be considered or considering the defendant's demurrer to the evidence was discussed and considered by the judge, but it does not appear that all the judges concurred with his views on that particular question. The question in considering the evidence of a witness on cross-examination with his evidence in chief does not in my judgment cover the case where there is a conflict in the evidence of two witnesses of the demurree as to a material fact. The same reasons do not apply in the latter case as in the former, if the contradiction is real and irreconcilable. It is well known to lawyers that it is no unfrequent occurrence for two or more witnesses, introduced by the same party, to concur in some material facts favorable to the party offering them as witnesses and to disagree or contradict each other, flatly, as to one or more other material facts. This disagreement may occur from different causes, from honest mistakes, defectiveness of memory, want of close attention to the subject, corruption in one or both of the witnesses, or from the ability of one witness to testify more correctly and truly as to the facts than the other, under the circumstances, and from other causes easy to imagine. When such contradiction occurs and the evidence of the witnesses cannot be reconciled, the triers must then in deciding the case necessarily determine as to the credibility of the witnesses and the weight to which the evidence of each witness is entitled under the circumstances of the case; and to determine these questions they should consider the manner of the witnesses. or either of them, in giving their tes-

timony before them, as well as call to their aid other facts and circumstances proven in the cause bearing on the question, &c. The question as to the credibility of the one or the other of the demurree's witnesses in such case, or as to whether the evidence of the one or the other shall be believed or discredited it seems to me, upon correct and well established legal principles is not for a court to determine upon a demurrer to evidence, and especially for an appellate court which does not see or hear any of the witnesses testify, to determine against the judgment of the court below, which saw and heard one or both of the witnesses give their evidence. Phillips on Evidence, ed. 1849, vol. 2, p. 467. In such case the proper question for the court in which the demurrer is filed, according to Judge Stanard's test, is, to ask itself in considering the demurrer, if the evidence as to the material fact in question had been submitted to a jury and the jury had found the fact favorable to the demuree, would the court be authorized under the law, as established, touching the granting of new trials, to set aside the verdict. Generally speaking, in cases where there is a real conflict in the testimony of two witnesses as to a material fact directly involved in the issue and the determination of the fact involves the credibility of the contradicting witnesses, the finding of the jury upon the fact will not be disturbed by the court. And such finding of the jury will not be disturbed by the appellate court where it has been approved by the court below. And in such case where there is a demurrer to the evidence and the court below which saw and heard such contradicting witnesses give their evidence, renders judgment in favor of the demurree, generally, the appellate court should not disturb the judgment by reversing it.

The reason urged by the counsel of the defendant why the policy declared on never became a binding contract between plaintiff and defendant is that from the evidence it appears that the plaintiff did not receive and accept the policy, but declined to do so unless, and until, cer-

tain alterations were made therein stated in the evidence of Barker and Barker's letter to Coen which appears in the evidence. On a careful examination of the evidence, written and parol, bearing upon the question, it seems to me that the jury might, upon the evidence, have found that the policy was delivered to the plaintiff near the time of its date and that he did then and there accept it and then and there made and delivered to the witness Barker from whom he received the policy, the notes of the said steamboat for the premium according to the terms of the contract of insurance made between plaintiff and defendant through said Barker, and the notes were received by the defendant and kept by it. This fact is expressly and directly testified to by Magee in his evidence and I think it may be inferred from the evidence of Barker in connection with his said letter to Coen without violating any just legal rule governing the fair and just construction of evidence. It is true that there is no contract unless the parties agree together about the same thing, in the same sense. And if, therefore, an offer is made by either party, there is no contract unless that offer be accepted without any variation in its terms. 2 Parsons on Contracts, 351, ed. of 1866. Some days before the policy was delivered to Magee (the captain of said steamboat) the contract of insurance was made, the amount of insurance, the length of time, the amount of premium to be paid, and when to be paid, and that the notes of the said steamboat were to be given therefor by Magee, were fully understood and agreed upon by the parties or their agents. It clearly appears that the policy was made in all respects according to the said contract and that the policy was delivered to plaintiff and at the time of the delivery the notes of said steamboat for the amount of the premium and payable at the time agreed upon were made and delivered as above stated. And from the whole evidence taken together and thus considered, I think it may well be concluded upon

68

1875.
June Term.

Miller, use, &c.,
v.
Insurance Co.
the principles governing courts in determining demurrers to evidence, to which I have referred, that a jury might well have found the fact of the acceptance of the policy by plaintiff. It seems to me therefore that this Court must consider upon the demurrer that the policy was accepted by the plaintiff and that it was a binding contract upon the parties according to its terms. The policy on its face acknowledges payment of the premium by the assured. There is no provision in the policy for its rescission or cancellation. I apprehend that the assured may accept a policy so as to be binding according to its terms, although he may at the same time request or desire some alterations to be made therein such as mentioned in this case. Of course much depends on the circumstances attending the transaction.

It is said that "the agreement for insurance is complete when the terms thereof have been agreed upon between the parties, and the reciprocal rights and obligations of the insurer and the insured date from that moment, without reference to the execution and delivery of the policy, unless these new elements are embraced within the terms agreed upon." May on Insurance, section 44. It is further said by same author in same section: "And on the completion of the negotiations the policy executed in accordance therewith, and dated on the day of the completion, though not actually delivered till afterwards, or at all, will take effect from its date, unless some other terms are expressly agreed upon." In the case of *Hallock v. The Com. Ins. Co.*, 2 Dutcher (N. J.) 268, it was *held:* that "the acceptance of a proposal to insure for the premium offered is the completion of the negotiation; and after it has been forwarded to the agent of the company for delivery the contract cannot be rescinded without the consent of the party insured. If the premium is tendered to the agent when application for insurance is made, and he does not receive it, but says he will consider it as paid, and authorizes the applicant to keep the money until the policy arrives, the contract will be as

binding upon the company as if the money was actually paid over to the agent. If an insurance company take a risk to commence previous to the date of the policy, and the property is destroyed before the policy is actually executed and delivered, where there is no fraud or concealment by the party insured, the company will be as much bound as if the loss occurred after the policy was delivered."

It is contended by the counsel for the plaintiff that there is no substantial contradiction between witnesses Magee and Barker; "that Barker says he sent the new policies back to Wheeling at Magee's request; that Magee says he requested him to do so, but that certain other things were also requested to be done first; that Barker omits to state the additional matters; that Magee states the matter more fully; that Barker does not state that Magee did not make the additional requests which Magee swears he did make; that they both agree there was a request." Barker states that he delivered the policy to Magee, and that Magee at the time delivered the said boat's notes to him for defendant for the premium. There is much plausibility in the view of plaintiff's counsel that there is no material contradiction between the evidence of Magee and Barker which cannot be reconciled. In Phillips on Ev., vol. 3, Am. ed. of 1850, it is laid down that "the testimony of witnesses apparently inconsistent is always to be so construed as, if possible, to exempt them from the imputation of perjury." But, under the view I have taken of the law of this case elsewhere, it is unnecesssary to determine definitely this question—it is immaterial.

It is suggested that the policy was cancelled. If the policy became of binding force it could not be cancelled by one party without the consent of another, ordinarily, there being no provision in the policy for its cancellation. And even if the defendant could cancel the policy, to make the cancellation operative the plaintiff should have notice thereof, or else the plaintiff might be

misled, deceived and defrauded. The fact of any notice of the cancellation of the policy by the plaintiff to the defendant is not proven, nor can it be inferred from the evidence.

It is also contended by defendant's counsel that the insurance for the year stated in the policy in suit was in truth abandoned by mutual consent. I do not think that such abandonment is proven, or that it should or can be properly inferred from the evidence upon the demurrer. In the case of *Nichols v. Michael,* 23 N. Y, 264 cited by defendant's counsel, it was held, as stated in the syllabus, that "The fraudulent vendee of goods and his assignee thereof for the benefit of creditors, are liable to a joint action by the vendor to recover possession, and that the where vendee gave his negotiable promissory note for the goods the vendor is not bound to tender such note at the time of rescinding the contract; it is sufficient for him to produce it upon the trial and deliver it to the custody of the court." In the case just cited, Judge James said : "Whenever property is obtained from another upon credit, with the preconceived design upon the part of the purchaser to cheat and defraud the vendor out of the same, the vendor, upon the discovery of the fraud, may avoid the contract and retake the property, unless it has passed to the possession of a *bona fide* holder for value. Such, I understand, was the conclusion of the court when this case was formerly before it. 18 N. Y., 295 : *Hall v. Naylor,* 18 N. Y., 588." The case last cited was a case of a purchase of property upon a credit with intent to cheat and defraud the vendor, and it was *held* that the vendor might avoid the contract upon discovering the fraud. The case was not in this respect analogous to the case in judgment. Here no fraud is alleged or proved against the plaintiff, and the right to cancel or avoid the policy did not exist without consent of parties after the policy became of binding force. In May on Insurance, section sixty-seven, it is said : "It need hardly be said that when the contract has

been once entered into and becomes binding upon the parties, it cannot be cancelled by either; nor can either party withdraw himself from its obligations without the consent of the other. And when negotiations are had between the parties with reference to the abrogation of a contract, the same rules apply as in making the contracts. * * The right of cancellation or notice reserved or given by the terms of the policy to either party should be exercised with care that the notice be explicit. A mere notice of a desire to cancel, with an agreement at the same time that the policy may remain till the assured can obtain other insurance, is not such an exercise of the right of cancellation or notice as will relieve the company from the obligations of the policy." *McAllister, Admx. v. New England Mutual Life Insurance Company,* 101 Mass., 558, 562.

The evidence in this cause is lengthy and voluminous and especially that of Magee and Barker, and I have not stated or compared and analyzed it in this opinion because unnecessary and it would make this opinion too lengthy. I have contented myself with stating the law as applicable to the case, as I understand it. The reporter will doubtless make a statement of the case, from the record, sufficient to make this opinion intelligible to the case, as presented by the demurrer to evidence. Upon the whole and for the reasons above stated, it seems to me that there is no error in the final judgment of the circuit court of the county of Ohio, rendered in this cause on the 15th day of December, 1873, and the same must be affirmed with costs and damages, according to law, to the defendant in error against the plaintiff in error.

Hoffman and Moore, Judges, concurred.

JUDGMENT AFFIRMED.