# WHEELING.

## GARRETT v. RAMSEY et al.

Submitted June 9, 1885.—Decided July 9, 1885.

1. The practice of inserting in a demurrer to evidence the evidence on both sides is proper. (p. 349.)

2. In such case the demurrant must be considered as admitting all that can reasonably be inferred by a jury from the evidence given by the other party, and as waiving all the evidence on his own part, which contradicts that offered by the other party, or the credit of which is impeached, and all inferences from his own evidence which do not necessarily flow from it. (p. 349.)

3. The evidence on a demurrer to the evidence should be interpreted most benignly in favor of the demurree ; so that he may have all the benefit, which might have resulted from the decision of the case by a jury, the proper forum, from which the decision has been withdrawn by the demurrant. (p. 349.)

4. Uninterrupted, honest and adverse possession for ten years in this State gives a right to recover land in an action of ejectment against the strongest proof of title, which independently of such continued adverse possession would be the better title. (pp. 364-5.)

5. Where there are conflicting grants or deeds to lands causing an interlock, and the elder grantee or owner is in the actual possession of a part of his land outside of the interlock, and the junior grantee or adverse claimant is in the actual possession of a part of the interlock claiming the whole to the extent of his boundaries, such possession of the former outside of the interlock will not limit the possession of the latter to his mere enclosure, but he will be held to be in the adverse possession of all the land in the interlock.—*Green, Judge, dissenting* on this last point. (p. 350.)

| | |
|---|---|
| 26 | 345 |
| 34 | 659 |
| 26 | 345 |
| 42 | 681 |
| 26 | 345 |
| 43 | 39 |
| 43 | 475 |
| 26 | 345 |
| 45 | 553 |
| 26 | 345 |
| f46 | 159 |
| 26 | 345 |
| 48 | 107 |
| 48 | 205 |
| 48 | 511 |
| 48 | 512 |
| 26 | 345 |
| 49 | 550 |
| 50 | 80 |
| 26 | 345 |
| 52 | 105 |
| 52 | 106 |
| 26 | 345 |
| 53 | 348 |
| 26 | 345 |
| 54 | 885 |
| 54 | 668 |
| 26 | 345 |
| 56 | 380 |
| 56 | 508 |
| 57 | 260 |
| 57 | 496 |
| 26 | 345 |
| 59 | 155 |
| 59 | 156 |
| 59 | 158 |
| 59 | 162 |
| 26 | 345 |
| 63 | 397 |
| 26 | 345 |
| f64 | 603 |

GREEN, JUDGE, furnishes the following statement of the case :

At April rules 1874 Hugh Garrett filed his declaration in ejectment in the circuit court of Harrison against John W. Ramsey and George F. Bussell claiming in fee a tract of land set out by metes and bounds lying in said county and containing 140 acres, from which he had been ejected by the defendants, laying his damages at $1,000.00. On May 25, 1874, the defendants pleaded not guilty ; and an order of survey was made and the case tried by a jury. On June 16, 1875, the

jury found a verdict for the plaintiff for a part of the land named in the declaration, the boundaries of the part so found being set out in the verdict. They found that the plaintiff was entitled to a fee in this part of the land found for him, and that the defendants were in possession of this part so found claiming title to it, when this action was commenced. On the motion of the defendants this verdict was set aside, and a new trial was awarded. On the second trial the jury found on December 15, 1875, for the plaintiff two separate parts of the land named in the declaration, these two parts being severally described in the verdict by metes and bounds. The verdict further found, that the plaintiff has an estate in fee simple in these parts of this land found for him. The defendants again moved the court for a new trial; and the court again set aside the verdict and granted a new trial upon their paying the costs incurred by the plaintiff. It is stated in the record, that the plaintiff took a bill of exceptions; but none appears in the record before us.

On May 23, 1881, a jury was again sworn to try the issue in this case, and the plaintiff and defendants introduced their evidence; and when it was all in, the defendants filed their demurrer to the evidence of the plaintiff, and the plaintiff joined in the demurrer, and thereupon the jury being required to find for the plaintiff part of the land in the declaration mentioned and to assess the damages which the plaintiff had sustained, if judgment should be given for the plaintiff on this evidence, found for the plaintiff, subject to the opinion of the court upon the demurrer to the evidence, a certain part of the land in the declaration mentioned described in the verdict by metes and bounds. They further found for the plaintiff an estate in *fee simple* in this part of said land and one cent damages against the defendants; but if the law arising upon the demurrer to the evidence should be for the defendants, they found for the defendants. The fact proven by the demurrer to the evidence, if construed as the law requires it to be on a demurrer to the evidence, was that the plaintiff failed to trace his title to the land in controversy by a regular chain of title to the State of Virginia, but did trace it by a regular chain of title to James Warren, who on November 30, 1836, conveyed a tract of 140 acres covering the land in

controversy to George A. Sommerville, whose title, the evidence showed, was held by the plaintiff.

The defendants claimed the land in controversy by a regular chain of titles to the State of Virginia and to a patent granted on October 20, 1786, for 500 acres of land to William Barkley, a portion of this 500 acre tract covering the land in controversy, and to it, the evidence showed, the defendants had the best title, they connecting their claim with the grant from the State of Virginia dated October 20, 1786. The tract of 140 acres named in the declaration, to which the plaintiff had a claim, so far as it covered the land in the controversy, was claimed by the plaintiff by a regular chain of title from the deed made by James Warren to George A. Sommerville on November 30, 1836. But it was proven that James Warren had no title to that portion of this land, which is in controversy in this suit. But this tract of 140 acres was by a mistake so surveyed, when Warren conveyed to Sommerville in 1836, that the lines in the deed also covered the disputed land, which was therefore an interlock between the tract of 140 acres claimed by the plaintiff and the portion of the tract of 500 acres claimed by the defendants. And the paper title of the defendants was better than that of the plaintiff, defendants' title coming from the grant of the State of Virginia made in 1786, while the plaintiff's title originated in the conveyance made in 1836, the grantor in the deed made in 1836 having no title in fact to this 140 acres, so far as it covered the land in controversy, but a perfectly good title except to that portion covered by the land in controversy.

The plaintiff's claim on this demurrer to evidence is based solely on the evidence in relation to the possession in fact by him of a portion of this interlock for more than ten years prior to the institution of this suit. There was no controversy as to this claim; but the land really in controversy was that portion of the interlock, which was in the boundary of the plaintiff's tract of 140 acres, but which was not in his actual possession, but which he claimed was in his constructive possession, because he was in the actual possession of two small parcels of the interlock, the evidence showing that he had been in the actual possession of two small enclosures one containing eight acres and fifteen poles and the other three

fourths of an acre.   The facts appearing from this demurrer
to evidence with reference to the possession were as follows :
The defendants and those under whom they claim had actual
possession of a considerable portion of that part of the tract
of 500 acres patented  by the State of Virginia in 1786, to
which they had a good title, and they had held possession of
a portion of this land for more than fifty-three years prior to
1876 ;  but no part of this . land so  in their actual possession
was within the interlock or was any part of the land in  con-
troversy, though  they claim, that the  whole land in contro-
versy was all this time in their constructive possession, as the
boundaries of their tract covered  the  whole land in contro-
versy.    They did not take  actual possession of any portion
of the land in controversy  within  the  interlock  till 1870,
about four years before the institution of this suit, when they
opened a coal mine on it.

The evidence in reference to the possession of the plaintiff
construed as it must be on a demurrer to evidence by the de-
fendants would establish the following facts :    Those under
whom  the  plaintiff  claim  this  tract of 140 acres  first took
possession of a small part of it, some fifty acres outside of
this interlock, in 1847, a small portion of which may have
been  within  the  interlock.   He took  possession of about
three fourths of an acre inside the interlock in 1853 and cul-
tivated it for some two  years and  has since then always
claimed and used it as a part of his land.    In 1856 the plain-
tiff had about eight acres more on the interlock cleared and
enclosed and cultivated it in crops for three years  and  then
put it in pasture for some eleven years, when he  again culti-
vated it in corn and the next  year in wheat and then  had  it
in pasture.    So that taking the evidence more favorably for
the plaintiff, he  must be  regarded  as in continuous actual
possession of this eight  acres of land within the interlock
from 1856 to 1874, when this suit was brought by him, based
on this possession.

These being all the facts proven, the court on the demurrer
to evidence of the defendants on September 22, 1881, ren-
dered the following judgment :

"This day came again the parties, by their attorneys, and
the court having maturely considered  the  demurrer to the

evidence joined at the last term of this court, it seems to the court the matter now in evidence to the jury is not sufficient in law to maintain the issue on the part of the plaintiff. Therefore it is considered by the court that the plaintiff take nothing by his suit, but for his false clamor be in mercy, &c.; and that the defendants go thereof without day and recover against the plaintiff their costs by them about their defence expended."

On the petition of the plaintiff a writ of error and *supersedeas* was granted him to this judgment.

*John Bassel* for plaintiff in error.

*Edwin Maxwell* for defendant in error.

GREEN, JUDGE :

In this case the defendant demurred to the evidence; and the evidence on both sides was properly inserted in the demurrer, as is well established by the authorities. (*Muhleman* v. *National Insurance Company*, 6 W. Va. 508, point 1 of syllabus.) In such case the demurrants, in this instance the defendants, must be considered as admitting all that can reasonably be inferred by a jury from the evidence given by the other party, in this case the plaintiff; and as waiving all the evidence on his own part which contradicts that offered by the other party, in this case the plaintiff, or the credit of which is impeached, and all inferences from his own evidence, which do not necessarily flow from it. (*Muhleman* v. *National Insurance Company*, 6 W. Va. 508, point 2 of syllabus.) As the demurrer to evidence by the defendants withdrew from the jury, the proper tryers of facts, the consideration of the evidence, by which the facts are to be ascertained, the plaintiff, whose evidence in this case was thus withdrawn from its proper forum, is entitled to have it most benignly interpreted by this substitute for the jury. The plaintiff in this case ought therefore to have all the benefit in the consideration of the demurrer to the evidence, that might have resulted in his favor from a decision of the case by the jury. (*Miller, use, &c.* v. *Insurance Company*, 8 W. Va. 515, point 2 of syllabus.)

If the evidence in this case is weighed according to these

well established rules, the case will present but the single question : Whether the possession by the junior patentee or party having the worse paper title will be limited to his enclosure, when the elder patentee or party holding the better paper-title has actual possession of a part of the land embraced in his grant or boundaries set out in his deed but not embraced within the limits of the grant, junior patent or the boundaries set out in the deed of the party holding the worse paper-title, that is not embraced in the interlock ? This question was made a *quære* in *Overton's Heirs* v. *Davisson,* 1 Gratt. 212, point 7 of syllabus, and to this day remains a mooted question in the Virginia courts, and has never been decided or even considered in the Supreme Court of Appeals in West Virginia. In considering this question it is all important, that we have a clear and distinct conception of several definitions and propositions, which may be regarded as undisputed here in this State and in Virginia.

First.—Adverse possession is one dependent on *adverse and conflicting title* grounded upon an *ouster* of the rightful owner, and which in case of a *freehold* is known as a *disseizin.* To constitute *adverse* possession there must be a possession *under claim of title,* and it must consist of an exclusive, continued, visible, notorious and hostile possession under a colorable claim of title. (*Dawson* v. *Watkins,* 2 Rob. 259; *Taylor's Devisees* v. *Burnsides,* 1 Gratt. 186; *Nowlin* v. *Reynolds,* 25 Gratt. 141 ; *Core* v. *Faupel,* 24 W. Va. 238.)

Second.—Actual possession, to constitute adversary possession, must be an *actual occupation* or else the use and enjoyment thereof by the act of ownership *equivalent* to such actual occupation. But no adversary possession can ever be acquired by any acts of ownership over the land, which fall short of such *actual occupation, use or enjoyment.* (*Taylor's Devisees* v. *Burnsides,* 1 Gratt. 166, syl. 4; *Overton's Heirs* v. *Davisson,* 1 Gratt. 812, syl. 8.)

Third.—Constructive possession, which may or may not be adversary possession, arises when one under color of title by patent, deed or other writing takes *actual possession* of a part of his land thus in law acquiring possession to the extent of his boundaries contained in his patent, deed or other writing. (*Lessees of Clark et al.* v. *Courtney et al.,* 5 Pet. 320.) This is

properly speaking *constructive* possession as distinguished from *actual* possession. It is however sometimes loosely spoken of as *actual* possession, because in many instances it operates just as though it was actual possession; but as in other instances it does not so operate, it ought to be carefully distinguished from actual possession, and the failure to distinguish between them has produced confusion and misunderstanding. This *constructive* possession has its origin in the maxim of the common law : "Possession of a part shall be construed as possession ot the whole," which, so far as I know is everywhere recognized.

Fourth.—Constructive seizin is seizin in law, where there is no seizin in fact. Thus, when the State issues a patent to a person who never takes any sort of possession of the land granted to him, he has nevertheless *constructive seizin* of all the land in his grant, though some one else be at the time in actual possession of it; for this actual possession of land belonging to the State is not regarded as adverse possession, as the State can not be disseized. So also, when a deed is made of a tract of land, no part of which is in the adverse possession of any one else, the grantor has constructive seizin of the whole of the land granted. (*Clay* v. *White,* 1 Munf. 162; *Green* v. *Liter,* 8 Cranch R. 229; *Clarke's Lessees* v. *Courtney,* 5 Pet. 318, 356; *Langdon* v. *Potters,* 3 Mass. R. 15.) This proposition is universally admitted to be true. But constructive seizin as thus defined is some times confounded with constructive possession as above defined. It is of course a matter of no importance by what terms we designate these several conditions above defined, *actual possession, constructive possession* and *constructive seizin ;* but as each of them is clearly and distinctly different from the others, it is unfortunate that they have frequently been confounded, because distinctive names have not been uniformly given to them. We in this opinion will take special care to avoid this confusion and will uniformly give to each its proper name according to the above definitions. In doing this I am aware that I may be giving a name to some one or more of them, which has not always been given by courts and judges; but I shall do so, because it is essential to keep them constantly distinguished the one from the other. Indeed while

these terms have not always been used with precision, yet the decisions have always recognized, that the conditions designated by them are themselves distinct and separate and have very different effects in determining the rights of parties, when questions of conflicting claims or adversary possession are to be determined.

To illustrate the real difference between these three conditions, we will suppose the State grants to a person a large tract of land, to which the State has good title. The patentee may take actual possession of the whole tract of land by enclosing and cultivating the whole of it. He has then actual possession of the whole tract of land; and he can not be disseized by any one else acquiring adversary possession thereof except by such person actually turning this patentee out of possession by force and taking actual possession of the land himself, claiming it as his own as by a subsequent grant to him by the State. Or such patentee instead of taking actual possession of the whole tract of land may take actual possession of a small part by enclosing and cultivating the same, but claiming title to the whole of it he has constructive possession of the whole; and as to such parts of it, as are not in his actual possession, he may be disseized by another without his using any force but by actually settling on a part of the land and enclosing and cultivating it and claiming title thereto, though in fact his title be not a good one, as for instance, when it is a subsequent patent from the State. The part so actually enclosed and cultivated by this junior patentee is in his adversary possession as against the senior patentee, the *constructive* possession of the senior patentee yielding to *actual* possession of the junior patentee. If we do not distinguish between these two sorts of possession but call them both *actual* possession, is it not obvious, that much confusion must necessarily be produced? for clearly, as shown by the above example, which all admit to be law, there is a marked difference between what I have called actual possession and what I have called constructive possession. If any one prefers different names for them I do not object; I only object to giving the same name to both.

If the senior patentee instead of taking possession of part of his land should take no actual possession of any part of

it, so that he had what we have called only *constructive* seizin
of the whole of his tract of land, and the junior patentee,
whose patent was entirely within the bounds of the senior
patentee, took actual possession by enclosure and cultiva-
tion of a part of the land in his patent, he would neverthe-
less have constructive possession of the whole of the land
included in his patent; and this constructive possession
would as effectually be regarded as adversary possession of
the whole as against the constructive seizin of the senior
patentee, as if the junior patentee had actual possession of
the whole. Then the constructive possession of the junior
patentee would oust the senior patentee, though he had,
before the junior patentee obtained his patent, constructive
seizin of the whole of the land including all that covered
by the junior patent. Thus a constructive seizin of the
senior patentee would yield to the constructive possession of
the junior patentee. This is undisputed law and shows the
marked difference between what we have called constructive
*seizin* and constructive possession. Yet these two have also
frequently been called by judges and law-writers by the same
name, constructive seizin, as I have called it, being often
called constructive possession, I do not claim that the names
I have adopted are peculiarly well chosen; but as the condi-
tions are obviously different, I insist that if confusion and
uncertainty are to be avoided, they should be known by
different names. For these reasons I will use the phrases
actual possession, constructive posession and constructive
seizin throughout this opinion as having distinct meanings
and according to the definitions I have given above, though
in so doing I may use the phrases in a different sense from
what they have been sometimes used by judges and law-
writers.

We will now consider the case before us of an interlock
between a senior patent or better title and a junior patent or
worse title.

First. Where neither party ever took any actual possession
under their respective patents or titles, when the senior
patent or older and better title was first issued or obtained,
the senior patentee or person holding the better title imme-
diately on the issuing of his patent or obtaining his title

would, as we have seen, admittedly have *constructive* seizin of his whole tract of land including of course the whole of the land included in what became an interlock, when the junior patent was issued or worse title obtained.   The junior patentee or holder of the worse title, when his junior patent was issued or when his worse title was obtained subsequently, would have constructive seizin of only such portion of sih land, as lay out of the interlock.   For he could not have *constructive seizin* of the interlock, as it was already in the constructive seizin of the senior patentee or holder of the older and better title, and it is obviously an absurdity for two persons holding adverse titles to be both constructively seized of the same land.   This proposition is obvious and is undisputed by any one.   This may be expressed by saying that the *constructive seizin* of the junior patentee must yield to the constructive seizin of the *senior patentee* where there is an interlock.

Second.   If the senior patentee never enters upon any part of the land patented to him and has no actual possession of any part of it either within or without the interlock, so that he has only a constructive seizin of his land patented to him including the interlock, and the junior patentee takes actual possession of a portion of the land patented to him outside of the interlock claiming title to the whole of his grant, so that he would have constructive possession of the whole of his grant including the interlock but for the fact that the senior patentee had constructive seizin of the land, when this *constructive possession* of the junior patentee arose, the constructive possession of the junior patentee arising from his actual possession of a part of his land outside of the interlock, extends only to all his lands lying outside of the interlock, and can not overcome the constructive seizin of the senior patentee to the whole of the interlock and thus work an ouster of him.   This is expressly decided in *Koiner* v. *Rankins' heirs*, 11 Gratt. 420, point 3 of syl. and pages 427 and. 428, and *Cline's heirs* v. *Catron*, 22 Gratt. 378, point 1 (II) of syl. and p. 392.   These Virginia decisions are fully sustained by decisions elsewhere.   (*Trimble* v. *Smith*, 4 Bibb 257; *Smith* v. *Mitchel*, 1 J. J. Marshall 208; *Pogue* v. *McKee*, 3 J. J. Marshall, 208; *Napier* v. *Simonson*, 10 Overton 448.)

The reasons, on which these decisions are based, are expressed in the opinion of the court in *Trimble* v. *Smith, supra.* The court say :

" The question presented by the agreed case is, whether the entry of settlement by the defendants upon that part of the land covered by their patent, which is not within the interference between the two patents, should be construed to give them posession of the land included within the interference. * * When there is no adverse possession, there can be no doubt that a man by an entry into a part of the tract may acquire possession of the whole provided he may lawfully enter upon the whole ; but to construe entry into part to which he has a right to give him possession of another part to which he has no right, would be making an act which was right in itself tortuous by construction. This would be wholly unwaranted and in direct violation of the principles of law, which requires that where an act is done, which is susceptible of twofold construction, one of which is consistent with law and the other not, that the former should prevail. A distinction is taken and obviously for good reason between the case where an entry is to have the effect of vesting or divesting an estate, and the case where the estate is already in the person making the entry and the possession vacant. In the former case an entry into part, gives possession of that part only ; but in the latter a general entry into part reduces the whole to actual possession. ' And therefore ' (says Coke) ' if the lord entereth into part generally for a mortmain, or the feoffee for a condition broken, or a disseizin into a parcel generally, the entry shall not vest or divest in these or like cases, but for that parcel. But where a man disseized of divers parcels, and the freehold is cast by law upon the heir, and the possession in no man, then the entry into parcel generally seemeth to vest the actual possession in him in the whole. Co. lit. b.' Now as the entry of the defendants in this case upon the part of their tract not within the interference, if construed to give them possession of the land within the interference, would have the effect of divesting the plaintiff of his rights, it is clear that such a construction is contrary to the law as laid down by Coke. Indeed if such a construction should prevail, a party having right might be di-

vested of his right without any wrong being in *fact* done him or any possibility of knowing that any was intended to be done."

This reasoning seems to me conclusive. Different reasons for a like conclusion are given by Judge Baldwin in *Taylor's Devisees* v. *Burnsides*, 1 Gratt. 196, but to my mind they are far less satisfactory. But his reasoning was approved by Judge Lee in *Koiner* v. *Rankin's Heirs*, 11 Gratt. 428-9.

Third.—If the senior patentee never entered upon any part of his grant, so that he was only *constructively seized* of the land including the interlock, and the junior patentee has actual possession of a portion of the land lying within the interlock and thus *constructive* possession of the whole of the interlock as well as of the land in his grant outside of the interlock, then the mere *constructive seizin* of the senior patentee to the land in the interlock must yield to this *constructive possession* of the junior patentee to all the land in the interlock, and the result is an ouster of the senior patentee from all the land in the interlock as effectual as though the junior patentee had *actual seizin* of all the land in the interlock. This seems entirely just and right. The constructive possession of the junior patentee acquired by taking possession of a part of the land in the interlock ought in that case to override the mere constructive seizin of the senior patentee. This is abundantly sustained by all the Virginia authorities. (*Overton* v. *Davisson*, 1 Gratt. 223-4; *Koiner* v. *Rankin's Heirs*, 11 Gratt. 427-8; *Cline* v. *Catron*, 22 Gratt. 392. See also *Buford* v. *Cox*, 5 J. J. Marshall 587, 589, 590; *Calk* v. *Lynn's Heirs*, 1 A. K. Marshall 346; *West* v. *Price's Heirs*, 2 J. J. Marshall 280; *Fox* v. *Hinton*, 4 Bibb 529.)

It appears then, if the senior patentee has mere *constructive seizin* of the interlock, it can not be overcome so as to work his ouster by the constructive seizin of the interlock by the junior patentee nor by the constructive possession of the junior patentee of the interlock, if that constructive possession of the interlock arose from the junior patentee having actual possession of a portion of his grant outside of the interlock; but if the constructive possession of the junior patentee arose from the actual possession by him of a portion of his grant lying within the interlock, then the

*constructive possession* of the whole of the interlock by the junior patentee will be an ouster of the senior patentee, where he has only a *constructive seizin* of the interlock.

When the senior patentee has not a *constructive seizin* of the land in his grant, as in the three cases heretofore considered, but constructive possession of the whole of his land by holding *actual possession* of a portion of it, then in case of an interlock and the junior patentee holding *constructive possession* also of the whole of his grant by reason of his holding *actual possession* of some portions of it within his grant, this will give rise to four different cases :

First.—When the senior patentee holds actual possession of a portion of his grant within the interlock and thus has *constructive possession* of all the land within his grant, and the junior patentee has also actual possession of a portion of his land within the interlock and thus *constructive* possession of the land within his grant, the constructive possession of the junior patentee can not overcome the constructive possession of the senior patentee and work an ouster of the senior patentee of all the land in the interlock not in the actual possession of the senior patentee, though it would obviously work an ouster of the senior patentee of that portion of the land in the interlock, of which the junior patentee had the actual possession, but the ouster would be confined to the land actually occupied by the junior patentee and could not be extended beyond that to the whole of the land in the interlock.   This seems to be an obvious and necessary result, as the *constructive* possession of the junior patentee could not oust the senior patentee of lands in his *constructive* possession, though the *actual possession* of the junior patentee to the extent of the land thus actually occupied would oust the senior patentee of lands, of which he had only a constructive possession.   This proposition is universally admitted by all courts and judges. (*Overton* v. *Davisson*, 1 Gratt. 224 ; *Koiner* v. *Rankin's Heirs*, 11 Gratt. 420, 427–8 ; *Cline* v. *Catron*, 22 Gratt. 392.)

Second.—If the senior patentee is in the *actual possession* of a portion of the interlock and thus in *constructive possession* of the whole of his grant including the whole of the interlock, and the junior patentee is in *actual possession* of a portion of

his grant outside of the interlock and thus has *constructive possession* of the whole of his land, it is obvious, that the *constructive possession* of the junior patentee can not overcome the *constructive possession* of the senior prtentee. This is admitted by all and indeed, as we have seen, the *constructive possession* of the jurior patentee arising, as in the supposed case we are considering, according to the Virginia cases would not even overcome the *constructive seizin* of the interlock by the senior patentee, and of course it ceuld not evercome his *constructive possession* of the interlock arising from his actual possession of a part of the interlock. (*Koiner* v. *Rankin's Heirs,* 11 Gratt. 420, 427–8 and *Cline's Heirs* v. *Catron,* 22 Gratt. syl. 1, 2, p. 392, point 1 (II) of syl.)

Third.—If the senior patentee is in actual possession of a portion of his land outside of the interlock and thus in constructive possession of the whole of his grant including the whole of the interlock, and the junior patentee is also in possession of a portion of his grant outside of the interlock and thus in constructive possession of all his land, it is obvious, that the constructive possession of the junior patentee can not overcome the constructive possession of the senior patentee. This is admitted by all and is sustained by the authorties just referred to.

Fourth.—When the senior patentee has actual possession of some part of the grant outside of the interlock claiming title to the whole and thus has constructive possession of all the land included in his grant including all the land in the interlock, and the junior patentee enters upon and takes actual possession of a part of the land included in the interlock claiming title to all the land included in his grant and thus but for the senior patentee's constructive possession of all the land in the interlock would have constructive possession of all the land within his grant including all the land in the interlock not in his actual possession, it would seem clear upon principal, that the *constructive possession* by the junior patentee of all the land in his patent including all the land in the interlock, had there been no conflict with the senior patent, can not take effect so far as the land in the interlock not in his *actual possession* is concerned; and there is nothing which can serve to overcome the *constructive possession* of the senior patentee and work an

ouster of him from all the land in the interlock not in the actual possession of the junior patentee. In other words the constructive possession by the senior patentee can not be overcome by the subsequent constructive possession by the junior patentee. We have seen, that in all other cases the prior constructive possession of the senior patentee is always held to be superior to and to destroy what otherwise would have been a constructive possession of the whole land lying within the interlock; and I can see no good reason why there should be an exception to this otherwise universal rule. Indeed it strikes my mind as absurd to hold in any conceivable case, that, when the senior patentee or party having the better title has *constructive possession* of the whole of the interlock, he can be ousted therefrom by the mere constructive possession of all the lands in the interlock by the junior patentee. One having a good title to the land and the constructive possession thereof certainly ought in no case to be ousted therefrom by one having a worse title and claiming only constructive possession of the land. Two parties in the nature of things can not have constructive possession of the same land. And as the constructive possession claimed by one must necessarily yield to the constructive possession claimed by the other, it seems to me to be almost absurd to say, that the party, who in such conflict must yield, is the party who has the best title and also the first constructive possession of the land. How can he be called on to yield to one, who has a worse title, and who claims to have a *constructive* possession originating subsequent to the unquestionable constructive possession of the senior patentee.

Plain as this proposition seems to be, it has been called in question by distinguished judges. But there has been no decision, which I have seen in this State or elsewhere, which controverted this proposition, but on the contrary there are numerous decisions which sustain it; and while there is no decision in Virginia or West Virginia affirming or denying this proposition, there are elsewhere many decisions, which affirm it, and none I have seen, which lay down the opposite proposition.

Among the cases, which sustain this proposition, is *Green v. Liter*, 8 Cranch 229. The proposition which we have

above laid down as law, is distinctly held to be the law for the reasons assigned in the answer given by the court to the tenth question found on page 250. The question answered is to be found on page 231.

The next case in the same court on this point is *Lsssee of Clarke* v. *Courtney et al*, 5 Pet. 320. In that case the party claiming under a defective deed entered into and held the *actual possession* of a part of the interlock, and the party having the better title was in possession of a part of his land outside of the interlock. The syllabus on this proposition we have laid down is: "When a person enters into land under a deed or title, his possession is construed to be co-extensive with his deed or title, and though the deed or title may turn out defective or void, yet the true owner will be deemed to be disseized to the extent of such deed or title. This however is subject to some qualifications. For if the true owner be at the same time, in possession of a part of the land, claiming title to the whole, then his seizin extends by construction of law to all the land, which is not in the actual possession or occupancy by enclosure or otherwise of the party claiming under the defective deed or title."

Both these cases were from Kentucky; but they were decided on common law principles, no statute of the State of Kentucky touching the subject being referred to by the court; and these decisions are clearly in accord with the Kentucky decisions. (*Bodly, &c.* v. *Logan's Heirs*, 2 J. J. Marsh. 254; *Layton* v. *Galloway, &c.*, 4 Bibb 101.)

From the cases of *Fox* v. *Hinton*, 4 Bibb 559 and *Calk* v. *Lynn's Heirs*, 1 A. K. Marsh. 547 it appears, that if, before any possession is taken by the senior patentee, the junior patentee enters upon the interlock and takes actual possession of a part of it, his possession will be construed to extend to the limits of the interlock, and a subsequent occupation by the senior patentee of a portion of the land outside of the interlock will not give him constructive possession within the limits of the interlock, but it will still remain in the constructive possession of the junior patentee. But the reasoning in these cases shows, that, if the senior patentee had taken actual possession of a portion of his patent outside of the interlock, his possession would be regarded as *constructively* ex-

tending to the limits of his patent, if he so claimed, and would include the whole of the interlock as in his constructive possession; and if subsequently the junior patentee took actual possession of a part of the interlock, he could gain no constructive possession of the whole interlock, but his ouster of the senior patentee would be confined to the land in the actual enclosure or occupancy by him. These views correspond with the views I have above expressed.

In the case of *Burns* v. *Swift et al*, 2 Serg. & R. 439, the court say: "Where the surveys interfere the act of limitation has no operation against him, who has the best right, except his opponent takes *adverse* and *exclusive* possession. Where there is no interference, possession of a part is in law possession of the whole. And it is this maxim, of *possession of a part being possession of the whole*, which has led some persons into error, by applying it to the case of interfering surveys, to which from the nature of things, it is not applicable. In the case of *Ringold, lessee* v. *Cheney*, in the general court of Maryland, the principle which I have mentioned with regard to interfering surveys was expressly decided. (Hall's Am. Law Journal No. 1, p. 128.) I understood Chief Justice McKean and brother Yates have recognized the same principle in decisions at *Nisi Prius*, and, indeed, I have always considered the law as very clear."

I have found no decisions, which controvert these decisions in other States; but it has been claimed, that the proposition, which I have above laid down, though fairly deducible from the decided cases ought not to be regarded as law in Virginia or West Virginia because of a statute in force in both States which declares: "In a controversy affecting real estate possession of a part shall not be construed to be possession of the whole, where an actual adverse possession can be proved." (1 R. C. p. 510, sec. 9; Code of Virginia, ch. 135, sec. 19, p. 560; Code of West Virginia, ch. 90, sec. 19, p. 520.) But it seems to me obvious that this statute has no bearing on the proposition under consideration; that what would *be constructive possession* of an entire tract of land shall not prevail as against *actual adverse possession*. This was law prior to the passage of this act, as it was a part of the common law. But as some doubt as to whether

this was the law has been created by the frequent calling of constructive possession actual possession by judges and text-writers, the legislature properly enacted this statute simply re-affirming the common law and thereby removing the doubts created by the loose use of terms which I have shown was common then and is still not unusual. The legislature simply distinguishes clearly between *constructive possession* and *actual possession*, so as to avoid the confusion which had arisen from not properly distinguishing between them. The familiar speaking of *constructive possession* as though it was the same as *actual possession*, had rendered the common law as laid down in this statute obscure; and to clear up this obscurity was, it seems to me, the obvious and only object of this statute. Though there is no decision in Virginia or West Virginia opposed to the proposition, which I have last above laid down, yet Judge Baldwin in *Taylor's Devisees* v. *Burnsides*, 1 Gratt. 196–8 does controvert this position. It is true on page 197 he frankly admits, that the current of authorities support the position, which I have taken, and are opposed to the contrary proposition laid down by him, but he regards them as inapplicable because of the statute I have quoted above. But it seems to me obvious that this statute has no application or bearing on this proposition as I have shown. Judge Stanard in this case on page 209 expressly dissents from this view of Judge Baldwin. It has been supposed that Judge Lee concurred in these views of Judge Baldwin in his opinion in *Koiner* v. *Rankin's Heirs*, 11 Gratt. 428. He says: "In the case of *Taylor* v. *Burnsides*, Judge Baldwin in an able and luminous opinion delivered by him adverts to *this question* and expresses views with which the opinion here advanced is strictly coincident. And it would seem to be fully supported by numerous authorties." He then refers to numerous authorities, all of which have been referred to by me in this opinion. A careful examination of this opinion of Judge Lee will show, that *the question* on which Judge Baldwin delivered a luminous opinion, in which Judge Lee concurred, was not the question, we are now discussing but a very different question, that is, where the senior patentee had never had any actual possession of any part of his land and of course no constructive possession

of the interlock but only *constructive seizin* thereof resulting simply from the issuing of his patent, and the junior patentee took actual possession of his land outside of the interlock. In such case Judge Baldwin in *Taylor* v. *Burnsides*, 196, expressed his views and was of opinion, that the junior patentee gained no constructive possession of the land in the interlock. And with this view Judge Lee concurred and I also concur. And even if by *this question* Judge Lee meant the one we are now discussing, still he expresses no sort of concurrence in the views on this question but simply says, that the views he had advanced on other questions, for he had advanced none whatever on this, would be strictly coincident with the views of Judge Baldwin. All the authorities which Judge Lee cites as sustaining these views of Judge Baldwin we have quoted; and they do fully sustain all of Judge Baldwin's views except those on the proposition we are considering, upon which, as Judge Baldwin himself admits, they are in opposition to his views. I do not therefore consider that Judge Lee intended to say he concurred with Judge Baldwin on this proposition, or that he intended to express any opinion on the subject; and the authorities he cites are opposed, as we have seen, to the views of Judge Baldwin on this proposition, though they are strictly co-incident with all his other views as well as the views of Judge Lee, so far as he expressed any in his opinion. But on the point we are now discussing he did not say one word.

So too Judge Anderson has been supposed to have expressed his views in *Cline* v. *Catron*, 22 Grat., and that they were like those of Judge Baldwin. He says on pp. 392–393 : " But if the junior patentee has an actual occupation and improvement of a part of the interlock, the actual possession of the junior patentee is co-extensive with the limits of his patent and is exclusive and adversary, and if continued uninterruptedly for the period of limitation defeats the elder patentee's right of entry or his better title as the case may be." He then cites the Virginia cases, which I have heretofore cited in Gratton.

Now this proposition is perfectly true and is fully sustained by the authorities cited, provided the senior patentee had no actual possession of any part of his lands, before the junior

patentee took possession of a part of the interlock. In such case the junior patentee's constructive possession does, as we have seen, " defeat the elder patentee's right of entry or his better title as the case may be." This I suppose is all that Judge Anderson meant; for he speaks of this principle being well settled. This is evidently the meaning attached to this rather loose language of Judge Anderson by professor Minor, who in his Institutes lays down this last proposition, as I have stated it, and as sustaining it refers to *Green* v. *Liter*, 8 Cranch 229 and the Virginia cases cited by Judge Anderson as well as the case of *Cline* v. *Catron*, 22 Grat. 392, which is the case, in which Judge Anderson expresses these views.

My conclusion therefore is, that when the senior patentee or party holding the better title takes actual possession of any part of his land claiming title to the whole of it, and subsequently the junior patentee or party holding the worse title takes actual adverse possession of any part of the interlock claiming title to the whole of it, he does not thereby oust the senior patentee or party holding the better title of any portion of the interlock, the whole of which he had constructive possession of excepting that portion in the enclosure or actual occupancy of the junior patentee. This conclusion is sustained both by reason and authority. It is true the legislature of West Virginia by an act passed March 8, 1879, ch. 61, p. 91 of Acts of 1879, changed this section 19 of ch. 90 of the Code of West Virginia and in so doing have changed the law, as I have laid it down above, and apparently adopted as law the views of Judge Baldwin, from which I have dissented. As this suit was instituted in April, 1874, it of course can not be affected by a statue-law passed five years afterwards.

It only remains then to apply the conclusion, which I have reached, to the facts in the case, And first we will observe, that the evidence shows, that the written title of the defendants is better than the written title of the plaintiff to all the land lying within the interlock; but if the plaintiff has by the evidence shown that he had actual or constructive possession, which was exclusive, continued, visible, notorious and hostile under colorable claim of title for a period of ten years of all the land included in the interlock, this would give him not only a conclusive defence to any action of ejectment for this .

land, which might be brought against him, but the result would be so absolute as to confer on him a perfect title to all the land included in the interlock and would enable him to sustain an action of ejectment against the defendants, though they had a perfect written title to the land, unless they had such adversary possession for ten years before the institution of the suit. This is an undisputed proposition so fundamental as to need no reference to any authorities to sustain it. But as stating it substantially I may refer to Judge Baldwin's opinion in *Taylor* v. *Burnsides,* 1 Grat. 189; *Moody* v. *McKim,* 5 Munf. 374 and *Middleton* v. *Johns,* 4 Grat. 129, I have mentioned ten years as the time one must hold such adversary possession in order to give him a perfect title even against the party, who has a perfect written title, because by our statute the right of entry and the right to bring an action to recover land is barred by ten years after the time the right to make such entry or bring such action first accrued. (Code of W. Va. ch. 104, sec. 1, p. 546.)

The only question is: Did the plaintiff in this case have such an adversary possession of all the land contained in the interlock? If he had, he should recover all the land in the interlock not already in the possession of the defendant. If he did not have such adversary possession, then the judgment of the circuit court against him must be affirmed. Under the rules we have laid down as to the weight to be given to evidence on a demurrer to evidence the plaintiff must be regarded as having such adversary possession for more than ten years of the two parcels of land, one containing about eight acres and fifteen perches, and the other three fourths of an acre lying within the interlock. Of this he still has such possession, and his title thereto is, on the principles we have laid down, perfect. But as it was not when this suit was brought either in the possession of or claimed by the defendants the plaintiff is entitled to no judgment in his favor in reference to these two parcels of land in his actual possession but only to a verdict, if this actual adversary possession of these parts of the land in the interlock gave him constructive possession of all the land in the interlock, from the time he or those under whom he claimed took actual adversary possession thereof.

The defendants' title is derived by a regular chain of title, the links of which are all perfect, from a patent of the State of Virginia issued October 20, 1786; and this tract of land has been occupied in part by defendants and those under whom they claim continuously, from 1816 to this time, they residing upon it or portions of it all the time. During all this time they claimed title to the whole tract of land owned by them respectively, the boundaries of which included what is now the interlock, the greater portion of which is the subject of controversy in this suit. But they never had actual occupation of any portion of this land in this interlock till 1870, about four years before the institution of this suit. But since 1816 they have at all times had *constructive possession* of this interlock, unless as a legal consequence of the fact, that the plaintiff and those under whom he claimed took possession of these two small parcels of land enclosed within the interlock, they were ousted of their constructive possession of the portions of this interlock in controversy.

They were admittedly ousted of the possession of the two small parcels of land, which were enclosed and occupied by the plaintiff and those under whom he claims. Were they ousted from the residue of this interlock not actually occupied by the plaintiff or those under whom he claims by a *constructive possession* on their part of his portion of the interlock now in controversy in this suit? If the principles we have laid down are correct, they clearly were not so ousted. The interlock had no existence till 1836, when a grantor, under whom the plaintiff claims by a regular and perfect train of title conveyed to a grantee the tract of 140 acres, to the portion of which not interlocking with the land claimed by the defendants this grantor had a perfect title, but to the portion, which did interlock, he had no title, he in selling off this land having by mistake so run it off, as to interlock with this grant of land by the State made October 20, 1786. Persons claiming under this grantee of 1836 took actual possession of a small portion of this interlock as early as 1847 and enclosed the two small portions, which we have named, more than ten years prior to 1870, when the defendants took actual possession of a part thereof for the first time. Upon this state of facts upon the principles, which we have laid down, the de-

fendants and those under whom they claim had constructive possession of this interlock continuously from 1816, till the plaintiff and those under whom he claims took actual possession of a portion of this interlock, a period exceeding thirty years. Having this constructive possession under a perfectly good title to the whole of this interlock for this great length· of time they were only ousted therefrom by those under whom the plaintiff claims to the extent that they took *actual possession*, that is to say, to the extent of the two small enclosures still held by the plaintiff in his actual possession. But they were obviously not ousted of any other portion of this interlock or of the land in controversy in this suit.

The plaintiff and those under whom he claims could not gain constructive possession of this portion of the interlock in controversy, for the obvious reason that the persons, under whom the defendants claim, already had constructive possession under a perfectly good title and had had this possession for more than thirty years. I am therefore clearly of opinion that the plaintiff and those under whom he claims never had possession real or constructive of the land really in controversy in this suit, and that for that reason the circuit court of Harrison county properly rendered judgment in favor of the defendants on the demurrer to the evidence.

SNYDER, JUDGE:

I am compelled to dissent from so much of the preceding opinion as relates to the effect of an actual possession by a junior grantee of a part of an interlock, when the actual possession of the senior grantee is outside of the interlock. But before discussing this matter I will notice a point raised in the oral argument not considered in that opinion.

The deed, dated March 18, 1811, from Alexander Ireland and wife to James Warren conveyed 140 acres of land by metes and bounds, and the deed, dated November 30, 1836, from said Warren to George A. Sommerville, after giving the metes and bounds of the land therein conveyed, which are materially different from those in the first mentioned

deed, describes the land conveyed therein as "containing 140 acres, being the same tract of land which Alexander Ireland and wife by their deed, bearing date March 18, 1811, conveyed to the said James Warren. The difference in the metes and bounds as given in the latter deed from those given in the former deed therein referred to is what creates the interlock causing this controversy. The counsel for the defendant in error insists that inasmuch as it is apparent from the conveyances that this difference was a mere inadvertence or mistake, and as Warren had no intention to convey any more or different land than that which had been conveyed to him by said deed from Ireland and wife, the land in controversy did not pass by the latter deed to Sommerville and his claim thereto could not form the basis of an adverse possession. If this were all that appeared, perhaps the position contended might be sound. 3 Washb. on R. P. 367. But the record shows that this alleged mistake was discovered more than twenty years before this action was brought, and at that time the plaintiff had run the line which the jury found in their verdict, and thereafter, with full notice to the defendant, claimed under said deed all the land up to said line including all the land in controversy. The foundation of an adverse possession has no reference to the quality or goodness of the claimant's title. In fact the whole doctrine of such possession rests upon the assumption that the claimant's title is bad, at least inferior to some other title. The principal office of a claim or color of title is to define the boundaries of the adverse holding, and the authorities are conclusive that a claim to land under a conveyance however inadequate to carry the true title to such land, and however incompetent might have been the power of the grantor in such conveyance to pass the title to the subject thereof, yet a claim asserted under the provisions of such deed is strictly a color of title and one which will draw to the possession of the grantee the protection of the statute of limitations. *Core* v. *Faupel*, 24 W. Va. 238–48. The extent of such possession must in the nature of things depend in a great measure upon the intent of the adverse holder and the acquiescence of the real owner. And, therefore, where the adverse claimant, by an actual entry on, and occupancy of, the

land under a color and claim of title, thus openly manifests such intention the law presumes notice thereof to the owner, and if the owner with such notice and in the face of such hostile intent, by his non-action and acquiesence permits such claim and adverse possession to continue for the statutory period, the law transfers the title to such adverse occupant without regard to the quality of his title in its inception. I therefore conclude that this position of the defendant in error can not be sustained. *Kincheloe* v. *Tracewells*, 11 Gratt. 588.

As I do not admit the correctness of certain definitions given in the preceding opinion, it may be proper, before proceeding to consider the main question, for me to state what I understand to be the legal meaning and application of the terms employed in this opinion.

The term *seizin* is a word which we derive from the feudal law and meant in that law the completion of the feudal investiture. It was the possession with an intent on the part of him who had it to claim a freehold interest. This is generally termed *seizin in fact*. *Towle* v. *Ayer*, 8 N. H. 57; 1 Washb. R. P. 35.

*Seizin in law* is a right of immediate possession according to the nature of the estate. Cornyn's Dig.—*Seizin*. (A. 1, 2.) A grant from the commonwealth gives a right of entry, and therefore confers a seizin in law, but not an actual seizin or seizin in fact. *Speed* v. *Buford*, 3 Bibb 57. In the present state of the law in the United States seizin simply means ownership. Since lands may be conveyed in this country by grant, and the possession transferred without livery of seizin, the distinction between seizin in law and seizin in fact has ceased to exist and is not now known in practice. *Bush* v. *Bradley*, 4 Day 305; *Bates* v. *Norcross*, 14 Pick. 224.

*Possession* is the detention or enjoyment of a corporal thing which one holds or controls by himself or by another who keeps or controls it in his name, and is either *actual* or *constructive*. *Actual possession* exists where the thing is in the immediate control or occupancy of the party or his agent or tenant. *Taylor* v. *Burnsides*, 1 Gratt. 165.

*Constructive possession*, as applied to lands, is that which exists in contemplation of law, without actual personal en-

joyment or occupation. It is simply ownership with the right of immediate actual possossion; and is, consequently, synonimous with the term *seizin* as now used in this country. *Hubbard* v. *Austin*, 11 Vt. 129; 2 Bla. Com. 116; *Storrs* v. *Frick*, 24 W. Va. 606.

A man can not physically occupy the whole of his lands at the same time or use every part of them to the same extent for the same purpose or in the same manner. His possession is necessarily more manifest and absolute as to some parts than it is as to the residue; therefore it is an established rule of law that the actual physical possession of a part gives to the person so in possession the actual possession of the whole tract or boundary covered by his title or color of title. Thus the true or apparent owner dwelling upon his farm by himself or his tenant, is as truly in the actual possession of his waters and unimproved woodland, however extensive they may be, as he is of his pastures, fields and gardens or that part of his land covered by his residence. The extent of his actual possession is co-extensive with and limited only by his title or color of title under which he claims. *Taylor* v. *Burnsides*, 1 Gratt. 165, 190; *Core* v. *Faupel*, 24 W. Va. 238, 244.

This rule is so absolute and controlling, that if the same owner or claimant has several co-terminous tracts under different claims of title, and he has actual possession of part of but one of such tracts, he will in law be regarded and treated as having the actual possession of the whole of each and all of said co-terminous tracts. *Overton* v. *Davisson*, 1 Grat. 216, 229.

*Adverse possession* is an actual, continued, visible and hostile possession under a claim or color of title. *Core* v. *Faupel*, *supra*.

From this definition as well as from necessity, there can be no such thing as *constructive* adverse possession. To bar the legal title there must be an actual entry on the land. And this intrusion must be accompanied by a claim or right to the land. The principle of the prescriptive bar is to treat him who has had the absolute dominion and enjoyment of the land for a given time as the true owner against all proofs to the contrary. It is this absolute dominion and enjoyment

which constitute actual possession. Constructive possession, as we have seen, is simply that possession or right of possession which the law ascribes to an owner not in actual possession. Therefore, seizin and constructive possession practically convey the same idea and they are frequently used in the same sense. But actual possession is radically different from either and means an actual occupancy with a claim of ownership. And an adverse possession can never be of the former class, but must in every case be of the latter, that is an actual possession.

In the preceding opinion the conclusion from which I dissent is the result, as I humbly conceive, of a misapplication of the phrase "constructive possession" and in assuming that there is a practical distinction in the law of this State between such possession and seizin. And it to a great extent ignores the plain and practical distinction between actual and constructive possession. It assumes that a person may be in the actual possession of one part and the constructive possession of another part of the same tract of land at one and the same time ; that while he is in the actual possession of his improved land and that outside of his enclosure which he uses and enjoys in connection therewith by taking water, wood, coal and other natural products therefrom, he is only in the constructive possession of all the rest of the tract. This is a doctrine, it seems to me, which is not only not warranted by the legal definitions of these terms, but it is utterly impracticable. How is the extent of this actual possession outside of the improved land and enclosure to be determined? The occupant may cut timber and remove coal or take water from one portion today and from another portion two or five miles therefrom tomorrow, he may dig gensang on one part at one time and gather berries or other natural products at a different time and place. Are these parts, thus used and enjoyed more or less, in his actual possession ? If so, what is the limit of his actual and where does his constructive possession begin? A mere reference to these and other difficulties that might be readily suggested demonstrates the impracticability of any such doctrine and the wisdom of the law which refuses to entertain it. According to the common law as well as the necessity of the subject a person can not be in the actual and constructive

possession of parts of the same land at the same time. The rule is universal, except when modified as hereinafter mentioned, that a person in the actual possession of a part of a tract of land under a title or color of title to the whole, is in the actual possession of the whole to the extent of his boundaries.

This rule in this State has two and only two qualifications. By the uniform decisions of the courts in this country and in England, where an adverse claimant, either with or without a color of title, makes an actual entry upon and occupies, under a claim of ownership, a part of the land so in the actual possession of the true owner and thereby dissiezes the owner, such owner will not be regarded as having either the actual or constructive possession of the land so actually occupied and held by such adverse claimant.

The other modification was made by the general assembly of Virginia by Statute passed as early as 1792. It, no doubt, regarding the common law rule as unsuited to the unimproved and unsettled condition of the lands of the State passed said statute which was continued in force up to the time this State was formed and it was then incorporated in our Code in the following words :

"In a controversy affecting real estate possession of part shall not be construed as possession of the whole, when an actual adverse possession can be proved." Sec. 9 ch. 90, Code p. 520.

One of the judges of the court of appeals of Virginia in the cases of *Taylor* v. *Burnsides*, 1 Grat. 165 and *Overton* v. *Davisson, Id.* 211, having dissented from the construction placed upon said statute by Judge Baldwin, who delivered the opinion of the court in those cases, and the third judge of the court of three judges sitting in those cases having expressed no opinion on the subject, the proposition now under consideration was made a *quære* in each of those cases, and the precise point never having since arisen in or been decided by that court or the Court of Appeals of this State, our legislature, in 1879, in order to remove the doubt raised by said *quære* and place this vexed question beyond further controversy in this State, passed an act which in effect affirms the law as stated by Judge Baldwin in the said cases. Ch. 61, Acts 1879, p. 91.

But as the case at bar arose prior to the year 1879, it must be decided without reference to the said act of 1879, except so far as may it be properly regarded as a legislative construction of the statute which it amended.

The whole history of the legislation of Virginia and of this State on the subject of land-titles shows a strong and manifest purpose to protect the rights of actual settlers and occupants of lands against the assertion of abandoned claims and neglected surveys held by adventurers and delinquent owners. It is a notorious and lamentable fact that as early as 1790 this State was shingled over with large grants containing not only thousands but often hundreds of thousands of acres, the same land frequently embraced in two or more of these grants, the owners neglecting to pay the taxes thereon or settle upon or improve them in any manner, but merely holding them for speculation to be resuscitated after years of neglect and apparent abandonment in the event they should be made valuable by the enterprise and industry of honest actual settlers claiming under titles believed to be good but which are often found to be junior grants. For a condensed review of the system of granting lands in the territory now covered by this State, the troubles it caused and the legislation adopted to remove its great evils and protect actual *bona fide* occupants and settlers, reference is here made to the opinion of this Court in *McClure* v. *Maitland*, 24 W. Va. 561.

The court of appeals of Virginia observing and applying, as I understand the decisions, these rules and general principles, have established beyond controversy the following propositions as the settled law of that and this State in cases where two grants conflict and occasion what is called an interlock:

First.—The elder grantee by the mere operation of his grant acquires at once constructive possession of all the land within his boundaries, although he has taken no actual possession of any part thereof. *Clay* v. *White*, 1 Munf. 162.

Second.—The junior grantee under his grant acquires a similar constructive possession of all the land embraced by his boundaries, except that portion within the interlock, the constructive possession of which had already vested in the elder grantee. *Clark* v. *Courtney*, 5 Pet. 318, 354.

Third.—Where the elder grantee is not in the actual possession of any portion of his land and the junior grantee enters and occupies a part of the interlock, claiming the whole within his boundary, he thereby ousts the elder grantee of his constructive possession and becomes actually possessed to the extent of his grant. *Koiner* v. *Rankin*, 11 Grat. 420-4. If the elder grantee is in the actual possession of any part of the interlock at the time of the entry thereon by the junior grantee, then the latter can gain no adversary possession beyond the limits of his mere enclosure without an actual ouster of the elder grantee from the whole of the land in the interlock. *Overton* v. *Davisson*, 1 Grat. 211; *Taylor* v. *Burnsides, Id.* 165.

This brings us to the proposition under discussion, stated as a *quære* in the two cases last cited as follows : "Whether the possession of the junior grantee will be limited to his enclosure, by the actual possession of the elder grantee of a part of the land embraced in his grant, not embraced within the limits of the grant to the junior grantee?

The third of the foregoing propositions proves conclusively the inaccurate use of the phrase *constructive possession* in the preceding opinion. The junior grantee, in that instance, having no title to the land in the interlock could not, under the rule stated in the second proposition, have constructive possession. To disseize the elder grantee of any part of the interlock the junior must have actual possession of such part. Adverse possession, as we have seen, must of necessity be actual. If, therefore, the possession of the junior grantee extends, as the law declares it does, beyond his enclosure, it can only do so because it is actual and not constructive. If it is not actual, all the authorities agree that he can not acquire title against the owner, because there can in the very nature of the thing be no constructive possession or seizin except by the owner. But the law as laid down in said third proposition, and fully sustained by the Virginia decisions, holds that the junior grantee is in the adverse and, therefore, necessarily, in the actual possession of all the land in the interlock although his enclosure, his *pedis positio*, may cover but a very small part of the interlock. This can not be true, if the possession of the junior grantee beyond his mere enclosure

is simply constructive, and can only be true when such possession both within and beyond his enclosure is actual; that is, his possession of his enclosure, while more manifest than is that of his woods and unimproved land outside of it and within the limits of his grant, still in legal effect his possession both within and beyond his enclosure is precisely the same, and is in law actual possession.

Proceeding directly to the proposition under enquiry. The elder grantee by his actual occupancy of a part of his grant is, under the common law rule before stated, in the actual possession of the whole grant including the interlock. His possession being thus actual, is equal in every respect to any actual possession which the junior could acquire by any possibility, and the elder, having the title as well as such actual possession, the junior could logically acquire no right by adverse possession even to such part of the interlock as he might enclose and of which he has the actual *pedis positio*. Two persons can not at the same time have the actual possession of the same land. The actual possession by the elder grantee as effectually excludes the junior grantee from the possession, in contemplation of law, of that part which he actually occupies and has enclosed as it does from that portion not so occupied and enclosed. This logical result of the common law rule has been, as before shown, so far modified by the decisions of the courts as to regard and treat the adverse claimant as in the possession of the land actually enclosed by him. And in my opinion this rule has been further modified by the statute of 1792, hereinbefore given as found in our Code of 1868.

This statute could not have been passed to protect merely the actual enclosure of the junior claimants, because that had been done by the decisions of the courts and had become the settled law of England and this country before the statute was enacted. Nor could it have been intended to protect the owner or *older grantee* against an adverse or *junior* claimant; for, the elder, having the title, was fully protected when in possession of any part of the *land in controversy* independently of the statute. Therefore, to give the statute any force or effect it must be held to embrace the case of an actual possession of the owner or elder grantee beyond, and

of an adverse or junior claimant within, the limits of the interlock of the conflicting grants, that is, of the land in controversy in the action. "The real estate in controversy" referred to in the statute is necessarily the land in the interlock, because the land outside of this whether within the elder or the junior grant is not in controversy; and the words "actual adverse possession," used by the statute just as necessarily and certainly refer to the possession of the junior claimant; for the word *adverse* if applied to the elder title would be meaningless, there being no such thing as an adverse possession by the true owner. The very term means, a possession adverse to the true owner, and as there can be but one title to the same land, such owner could not be an adverse claimant, unless it might be absurdly supposed that he could hold adversely to himself. The owner or elder grantee never holds adversely to a junoir claimant, who has no title but merely a color of title. If the owner is in possession at all, he is there as owner and by virtue of his title and not as an adverse claimant. This construction of the statute is not only reasonable and consistent with its language and in harmony with the legislative policy of the State, as before indicated, but in view of the settled law of England and this country prior to its enactment it is the only construction that can be made so as to give the statute any effect whatever as altering the common law as it then existed. It must be supposed the legislature intended to make some change in the existing law; for otherwise, we would have to hold that it has acted without any object or purpose, a thing under the settled rules of construction the courts are not permitted to do, if it can reasonably be avoided. I, therefore, conclude that the *quære* or proposition under discussion should be decided in the affirmative; that is, where the elder grantee is in actual possession of the land covered by his grant outside of the interlock and the adverse or junoir claimant is in the actual possession of a part of the land in the interlock claiming the whole, he will in contemplation of law and by force of the said statute be treated as being in the actual possession of the whole land embraced within his grant or color of title.

The foregoing conclusion is fully sustained by the able and instructive opinion of Judge Baldwin in *Taylor* v. *Burnsides*,

1 Grat. 190. · It is also sustained by the opinion of Judge Lee, as I understand it, in the case of *Koiner* v. *Rankin*, 11 Grat. 424, and by the decision of the court in *Cline* v. *Catron*, 22 Grat. 378, 392, though the question was not directly presented by the record in the two latter cases.

The conclusion above announced imposes no unreasonable hardship—its result is the same as it is in every case of the application of the statute of limitations. It simply requires that ordinary diligence which is necessary in any case to protect rights which may be lost by *laches* and negligence. But the hardship, if it can be so regarded, is fully counterbalanced and overcome by the necessities arising out of the extensive regions of wild and unimproved lands in this State which have been settled upon by *bona fide* holders under junior grants. These settlers could not be otherwise protected in their just rights.

The owner knows, or ought to know, the boundaries of his own land, and that his adversary has settled within them claiming and exercising dominion, control and ownership over the interlock. If under such circumstances he is quiescent and fails to assert his right to the interlock by action or entry thereon, he can not complain if he is barred by the statute of limitations. The junior claimant by his actual entry and occupancy on any part of the interlock puts himself in a position to be sued in ejectment or other form of action. But the senior grantee by confining his actual possession to his land outside, or even within the interlock, he having the title, does not subject himself to an action; and, consequently, unless the statute gives the junior claimant's possession effect to the extent of his claim and boundary, he can never acquire an adverse possession beyond his mere *pedis positio* or enclosure, and his color of title has no operation whatever, because he may hold his enclosure under a mere claim without any paper-title of any kind. · *Kincheloe* v. *Tracewells*, 11 Grat. 587

The statutes of limitations are statutes of repose and are dictated by a wise policy founded upon the presumption against him who has unreasonably delayed the assertion of a right and in favor of him who has long exercised the rights and dominion of owner. They are not made for the protection of wrong-doers; and because they apply between hostile

pretensions and against the apparently better right, they are not in fact a protection to wrong-doers, but the instruments of giving effect to a necessary public policy; and they are more frequently in aid of the right than they are in support of anything that can be regarded as unjust or inequitable. To illustrate in the case of conflicting titles to land: The commonwealth issues a grant to one person for a large boundary of unimproved land, and a few days after issues another grant to another person, but by the mistake of the commonwealth, or its system of granting lands, a part of the land embraced in the first is also embraced in the second grant. Here neither grantee is at fault, both have acted in good faith and paid the same consideration for his land. The junior grantee settles upon and improves his land, then sells it to a third person for a full consideration, and thus sale after sale takes place, and then, perhaps after several generations, none of whom had any notice of the senior grant, a suit is brought by some one claiming under the senior grantee and on the trial it is shown that five or twenty miles from the land in controversy some tenant of the senior grantee, or those claiming under him, has had a bare possession by a cabin built on it and occupied or by the enclosure of a few acres, a possession taken and held, perhaps for no other purpose than to entrap *bona fide* or other adverse owners. If in such case the position I am opposing should prevail, the junior holders being actually on the interlock all this time and claiming, buying and selling the whole land embraced in their grant, would be confined to their *pedis positio* or mere enclosure, and the senior claimants, who acquiesed and slept all this while, would take all the residue of the land in controversy. Such a result would surely not be regarded as just and right. Nor would the rule for which I am contending if applied in such case protect a wrong-doer, or defeat the ends of justice and right.

From what has preceded it is apparent that the authorities cited and relied on in the preceding opinion have, in my view of the question, no bearing or application in this case: They are decisions based upon the common law made in States which have no statutes changing that law, as I have attempted to show is the case in Virginia and this State. I have con-

ceded the general law and the correctness of the decisions interpreting that law, but I hold that the statute and policy of the legislature in Virginia and this State have modified and so changed that law as to make it and the decisions based on it wholly inapplicable and foreign to the question considered in this opinion. Upon all other points and questions in this cause, I fully concur in the preceding opinion of Judge Green.

For the reasons aforesaid I am of opinion that the judgment of the circuit court should be reversed, and judgment entered here on the demurrer to evidence in favor of the plaintiff for the land found by the verdict of the jury, which is accordingly ordered.

Johnson, President, and Woods, Judge, concur in the foregoing opinion of Judge Snyder and also in so much of the preceding opinion of Judge Green as is not in conflict therewith.

REVERSED.